United States Federal Court

Northern Division

501 E. Court Street, Suite

Jackson, Mississippi 2500

39201

TO: The Most Honorable Federal Judge
William H. Barbour Jr.

FROM: MR. Donald Williams Jr #187184

EMCF-Prison

10684 Hwy 80

Meridian, MS

DATE: June 24, 2024

RE: 42(Title 42) Section 1983 Conditions of
Forms and Civil Cover Sheet
Confinement (Requested)

Dear Judge Barbour,

My name is Donald Williams, Jr.
I, was Born and Raise in New Orleans LA.
My date of Birth, is March 12, 1965.
My Social Security Number is 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.
I was Raised by the finest of working-class
and middle class Black Folks..          Page 1

I wish to move forward as i sit and wait on my freedom. I must have legal protection, otherwise, I'm a sitting duck.

Please, I need your powerful hard, and your great wisdom of the law for material

I need you are you clerk to assign me a docket, as soon as possible. So as I can a file a "TRO" Temporary Restraining Order rule 65(A)(B)

I, need any and all forms to file a 42 Sections 1983 Lawsuit for conditions of confinement only.

Also, I need all legal information to properly address the face of the complaint in terms of proper jurisdiction and proper venue.

Jury Trial will be entered indeed. also Defendants Sued in both capacities; official and individual:

Secureel my legal documents as they will be needed. In addition, please contact the most Honorable Judge Patrick E. Higginbotham, let him know my Lawsuit will seek 75,000.00 in your court only; for conditions of confinement.

Please, again Stamp Notary my Affidavits and send me one copy. page 3   Respectfully Williams

Meridian, MS
Zip code
39307

Tell her to bring
her Notary Stamp
on the 6-24-2024
Jury Trial Demanded

Write Letter
face of to Judge William H. Barbour, JR.
the complaint

All
Defendants
sued in
their
official
and
individual
capacities

all Forms and venue/Jurisdiction
INFO
Needed

42 Section 1983

Condition of Confinement

Multi-Aggravated punitive damages
In excess of
$ 75,000.00

1ST. Motion TRO Rule 65(A)(B)

2nd Motion is Evidentiary OMBUDMAN Hearings

*FBI No. 19-008 [handwritten annotations]* *Stop run C 211*

**Mississippi Department of Corrections**
**Inmate Legal Assistance Program Request Form**

I. Identification of Inmate: Name _Williams Donald_ Date _6-7-2024_
MDOC# _13185_ Unit ____ Zone _34_ Bed ____
Custody Level: A B C D PC AS Work Assignment & Hours ____

*RECEIVED JUN 1 0 2024 BY.................*

II. Type of Assistance Requested:
  a. ____ Packet on Post-Conviction Collateral Relief
        ____ 1. First Step (basic information on when and how to file)
        ____ 2. Second Step (first step must be completed prior to this request)
  b. ____ 42 U.S.C.A. 1983 Form (designate Northern or Southern District)
        You must provide the nature of the complaint and have completed the ARP process. .....................
  c. ____ 28 U.S.C.A. 2254 Habeas Corpus Form (Northern or Southern District)
  d. ____ Need to review policy on ____
  e. ____ ARP/ARP appeal to be mailed. DEADLINE DATE ____

**IN ORDER TO REQUEST SERVICES BELOW THIS LINE, YOU MUST PROVIDE THE CAUSE NUMBER OF YOUR ACTIVE CASE:** _Case No. 19-008_ *FBI Case No.*

  f. Conference because I cannot read or write: (Please provide a short description of your question)
        ____
        ____

  g. Conference because:
    1. I need clarification on a certain area of the law:
        ____
        ____ *Back*
        ____
    2. My case has advanced to a point where I cannot proceed alone: (list last action taken)
        ____
        ____
    3. I need emergency assistance in meeting a deadline on (date) ____
*(If you are requesting immediate access to the legal assistance program, prior to your regularly scheduled day, you must present paperwork verifying the deadline and inform your tower officer.)*
  h. Copy of Cited Case(s): _Case Law, Mike Carter ; 544 U.S. 164_
    1. _Indiana V Edwards ; 544 U.S. 164 2008_
    2. ____
    3. _Pennsylvania V Finley 481 U.S 551 1987_
  i. Copy of Statute(s): ____
  j. Rules of Court: ____
  k. Supplies: Pen ✓ Paper ✓ _Instruct Dept 2024 Report on the_
  l. Copies (list document to be copied) ____ _MSDOC_
  m. Mail Services: ____
  n. Notary Services: (ID required) List document to be notarized: ____

By my signature affixed below, I acknowledge that MDOC Policy 20.01, effective 12/15/97, provides reasonable access of Inmates to the Courts which may be used to initiate legal actions pertaining to my Mississippi sentence and/or confinement within written prescribed security and conduct limits.

I understand that any disruptive behavior will result in my immediate removal from the Legal Assistance office. Further, I understand a rule violation report may be filed against me as a result of any disruptive behavior, use of profane language, or attempt to access legal assistance under false pretense.

I also understand that this form must be fully completed by me unless I am unable to write. However, all requests must be signed by the person who is requesting assistance.

Signed, this the _1_ day of _June_ 20_24_

_Donald Williams_
Signature of Inmate

MTC GP

D. Killman    U.S. Legal Mail

White male    Drop 6-7-2024

at 6:50

Please be Advised the following documents
are needed to execute legal Representation
in the above named counsel. FBI action #
19-60189

United States Federal Judge
The Most Honorable Chief
Sir PATRICK E. Higginbotham
600 Maestri Place
Fifth Circuit
New Orleans LA        Declaration Federal

Under Title 28 USC Section 1746 Witnessed
Dave 6-7-2024
Corrections Officer D. Killman did
place U.S. Legal Mail to the Judge
in New Orleans LA on 6-7-2024 at
6:50 A.m. he (is a white male)
Motion For Aggravated Austin, Ranse Bryant
Ron King next!!



# East Mississippi Correctional Facility

## ILAP Response Form

**Inmate Name:** **Donald Williams Jr**                    **187184**

**Housing Assignment:** **5-C-211**

**Date:** **6/13/2024**

**Library Response:**

Your ILAP form reflects that you requested a "Unsworn Declaration pursuant to 28 USC 1746…which was enclosed in your previous packet and again in this one.

YOU DID NOT REQUEST A BLANK AFFIDAVIT. EVEN SO, AN AFFIDAVIT IS NOT AN UNSWORN DECLERATION….AS IT WOULD HAVE TO BE NOTARIZED.

However, I have enclosed "A BLANK AFFIDAVIT" in this packet & a copy of your ILAP form.

*LIBRARY*

## *Bmw of N. Am. v. Gore*

Supreme Court of the United States

October 11, 1995, Argued ; May 20, 1996, Decided

No. 94-896.

**Reporter**

517 U.S. 559 *; 116 S. Ct. 1589 **; 134 L. Ed. 2d 809 ***; 1996 U.S. LEXIS 3390 ****; 64 U.S.L.W. 4335; 96 Cal. Daily Op. Service 3490; 96 Daily Journal DAR 5747; 9 Fla. L. Weekly Fed. S 585

BMW OF NORTH AMERICA, INC., PETITIONER v. IRA GORE, JR.

**Prior History: [****1]** ON WRIT OF CERTIORARI TO THE SUPREME COURT OF ALABAMA.

**Disposition:** *646 So.2d 619*, reversed and remanded.

# Syllabus

After respondent Gore purchased a new BMW automobile from an authorized Alabama dealer, he discovered that the car had been repainted. He brought this suit for compensatory and punitive damages against petitioner, the American distributor of BMW's, alleging, *inter alia*, that the failure to disclose the repainting constituted fraud under Alabama law. At trial, BMW acknowledged that it followed a nationwide policy of not advising its dealers, and hence their customers, of predelivery damage to new cars when the cost of repair did not exceed 3 percent of the car's suggested retail price. Gore's vehicle fell into that category. The jury returned a verdict finding BMW **[****2]** liable for compensatory damages of $ 4,000, and assessing $ 4 million in punitive damages. The trial judge denied BMW's post-trial motion to set aside the punitive damages award, holding, among other things, that the award was not "grossly excessive" and thus did not violate the *Due Process Clause of the Fourteenth Amendment*. See, *e. g., TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 454, 125 L. Ed. 2d 366, 113 S. Ct. 2711*. The Alabama Supreme Court agreed, but reduced the award to $ 2 million on the ground that, in computing the amount, the jury had improperly multiplied Gore's compensatory damages by the number of similar sales in all States, not just those in Alabama.

*Held:* The $ 2 million punitive damages award is grossly excessive and therefore exceeds the constitutional limit. Pp. 568-586.

(a) Because such an award violates due process only when it can fairly be categorized as "grossly excessive" in relation to the State's legitimate interests in punishing unlawful conduct and deterring its repetition, cf. *TXO, 509 U.S. at 456*, the federal excessiveness inquiry appropriately begins with an identification of the state interests that such an **[****3]** award is designed to serve. Principles of state sovereignty and comity forbid a State to enact policies for the entire Nation, or to impose its own policy choice on neighboring States. See *e. g., Healy v. Beer Institute, 491 U.S. 324, 335-336, 105 L. Ed. 2d 275, 109 S. Ct. 2491*. Accordingly, the economic penalties that a State inflicts on those who transgress its laws, whether the penalties are legislatively authorized fines or judicially imposed punitive damages, must be supported by the State's interest in protecting its own consumers and economy, rather than those of other States or the entire Nation. Gore's award must therefore be analyzed in the light of conduct that occurred solely within Alabama, with consideration being given only to the interests of Alabama consumers. Pp. 568-574.

(b) Elementary notions of fairness enshrined in this Court's constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose. Three guideposts, each of which indicates that BMW did not receive adequate notice of the

magnitude of the sanction that Alabama might [****4] impose, lead to the conclusion that the $ 2 million award is grossly excessive. Pp. 574-575.

(c) None of the aggravating factors associated with the first (and perhaps most important) indicium of a punitive damages award's excessiveness -- the degree of reprehensibility of the defendant's conduct, see e. g., Day v. Woodworth, 54 U.S. 363, 13 HOW 363, 371, 14 L. Ed. 181 -- is present here. The harm BMW inflicted on Gore was purely economic; the presale repainting had no effect on the car's performance, safety features, or appearance; and BMW's conduct evinced no indifference to or reckless disregard for the health and safety of others. Gore's contention that BMW's nondisclosure was particularly reprehensible because it formed part of a nationwide pattern of tortious conduct is rejected, because a corporate executive could reasonably have interpreted the relevant state statutes as establishing safe harbors for nondisclosure of presumptively minor repairs, and because there is no evidence either that BMW acted in bad faith when it sought to establish the appropriate line between minor damage and damage requiring disclosure to purchasers, or that it persisted in its course of [****5] conduct after it had been adjudged unlawful. Finally, there is no evidence that BMW engaged in deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive. Pp. 575-580.

(d) The second (and perhaps most commonly cited) indicium of excessiveness -- the ratio between the plaintiff's compensatory damages and the amount of the punitive damages, see e. g., TXO, 509 U.S. at 459 -- also weighs against Gore, because his $ 2 million award is 500 times the amount of his actual harm as determined by the jury, and there is no suggestion that he or any other BMW purchaser was threatened with any additional potential harm by BMW's nondisclosure policy. Although it is not possible to draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case, see, e. g., id., at 458, the ratio here is clearly outside the acceptable range. Pp. 580-583.

(e) Gore's punitive damages award is not saved by the third relevant indicium of excessiveness -- the difference between it and the civil or criminal sanctions that could be imposed for comparable misconduct, see, e. g., Pacific Mut. [****6] Life Ins. Co. v. Haslip, 499 U.S. 1, 23, 113 L. Ed. 2d 1, 111 S. Ct. 1032 -- because $ 2 million is substantially greater than Alabama's applicable $ 2,000 fine and the penalties imposed in other States for similar malfeasance, and because none of the pertinent statutes or interpretive decisions would have put an out-of-state distributor on notice that it might be subject to a multimillion dollar sanction. Moreover, in the absence of a BMW history of noncompliance with known statutory requirements, there is no basis for assuming that a more modest sanction would not have been sufficient. Pp. 583-585.

(f) Thus, BMW's conduct was not sufficiently egregious to justify the severe punitive sanction imposed against it. Whether the appropriate remedy requires a new trial or merely an independent determination by the Alabama Supreme Court of the award necessary to vindicate Alabama consumers' economic interests is a matter for that court to address in the first instance. Pp. 585-586.

**Counsel:** Andrew L. Frey argued the cause for petitioner. With him on the briefs were Kenneth S. Geller, Evan M. Tager, Michael C. Quillen, Dennis J. Helfman, and David Cordero.

Michael H. Gottesman argued [****7] the cause for respondent. With him on the brief were Jonathan S. Massey, Andrew W. Bolt II, John W. Haley, Bruce J. McKee, Kenneth J. Chesebro, and Stephen K. Wollstein. *

---

* Briefs of amici curiae urging reversal were filed for the American Automobile Manufacturers Association et al. by Kenneth W. Starr, Paul T. Cappuccio, Christopher Landau, Richard A. Cordray, and Phillip D. Brady; for the American Council of Life Insurance et al. by Patricia A. Dunn, Stephen J. Goodman, Phillip E. Stano, and Theresa L. Sorota; for the American Tort Reform Association et al. by Victor E. Schwartz, Scott L. Winkelman, Sherman Joyce, and Fred J. Hiestand; for the Business Council of Alabama by Forrest S. Latta; for the Center for Claims Resolution by John D. Aldock and Frederick C. Schafrick; for the Chamber of Commerce of the United States of America by Timothy B. Dyk, Stephen A. Bokat, and Robin S. Conrad; for the Farmers Insurance Exchange et al. by Irving H. Greines, Robin Meadow, Barbara W. Ravitz, and Robert A. Olson; for the Life Insurance Company of Georgia et al. by Theodore B. Olson, Larry L. Simms, Theodore J. Boutrous, Jr., John K. Bush, Theodore J. Fischkin, and Marcus Bergh; for the National Association of Manufacturers by Carter G. Phillips and Jan Amundson; for the New England Council et al. by Stephen S. Ostrach; for Owens-Corning Fiberglas Corporation by Charles Fried, Michael W.

**[****8]**

**Judges:** STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion, in which O'CONNOR and SOUTER, JJ., joined, post, p. 586. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, post, p. 598. GINSBURG, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, post, p. 607.

**Opinion by:** STEVENS

# Opinion

**[***818] [*562] [**1592]**   JUSTICE **STEVENS** delivered the opinion of the Court.

[1A][2]The *Due Process Clause of the Fourteenth Amendment* prohibits a State from imposing a "'grossly excessive'" punishment on a tortfeasor. *TXO Production Corp. v. Alliance [***819]   Resources Corp., 509 U.S. 443, 454, 125 L. Ed. 2d 366, 113 S. Ct. 2711 (1993)* (and cases cited). The wrongdoing involved in this case was the decision by a national distributor of automobiles not to advise its dealers, and hence their customers, of predelivery **[**1593]** damage to new cars when the cost of repair amounted to less than 3 percent of the car's suggested retail price. The question presented **[*563]   [****9]** is whether a $ 2 million punitive damages award to the purchaser of one of these cars exceeds the constitutional limit.

I

In January 1990, Dr. Ira Gore, Jr. (respondent), purchased a black BMW sports sedan for $ 40,750.88 from an authorized BMW dealer in Birmingham, Alabama. After driving the car for approximately nine months, and without noticing any flaws in its appearance, Dr. Gore took the car to "Slick Finish," an independent detailer, to make it look "'snazzier than it normally would appear.'" *646 So. 2d 619, 621 (Ala. 1994)*. Mr. Slick, the proprietor, detected evidence that the car had been repainted. [1] **[****10]** Convinced that he had been cheated, Dr. Gore brought suit against petitioner BMW of North America (BMW), the American distributor of BMW automobiles. [2] Dr. Gore alleged,

---

Schwartz, and Karen I. Ward; for Owens-Illinois, Inc., by Griffin B. Bell and David L. Gray; for Pharmaceutical Research and Manufacturers of America by Andrew T. Berry; for the Product Liability Advisory Council, Inc., et al. by Malcolm E. Wheeler; for the TIG Insurance Company by Ellis J. Horvitz, Barry R. Levy, Frederic D. Cohen, and Mitchell C. Tilner; and for the Washington Legal Foundation et al. by Arvin Maskin, Steven Alan Reiss, Katherine Oberlies, Daniel J. Popeol, and Paul D. Kamenar.

Briefs of amici curiae urging affirmance were filed for the Alabama Trial Lawyers Association by Russell J. Drake; for the Association of Trial Lawyers of America by Jeffrey Robert White, Cheryl Flax-Davidson, and Larry S. Stewart; and for the National Association of Securities and Commercial Law Attorneys by Kevin P. Roddy, James P. Solimano, Steve W. Berman, and Jonathan W. Cuneo.

Briefs of amici curiae were filed for CBS, Inc., et al. by P. Cameron DeVore, Marshall J. Nelson, Douglas P. Jacobs, Jonathan E. Thackeray, John C. Fontaine, Cristina L. Mendoza, William A. Niese, Karlene Goller, Susan Weiner, Richard M. Schmidt, Jr., R. Bruce Rich, Slade R. Metcalf, Jane E. Kirtley, Bruce W. Sanford, and Henry S. Hoberman; for Trial Lawyers for Public Justice, P. C., by Leslie A. Brueckner and Arthur H. Bryant; for Richard L. Blatt et al. by Mr. Blatt, pro se, and Robert W. Hammesfahr, pro se; for James D. A. Boyle et al. by Arthur F. McEvoy III, pro se; and for Kenneth G. Dau-Schmidt et al. by Mark M. Hager, pro se.

[1] The top, hood, trunk, and quarter panels of Dr. Gore's car were repainted at BMW's vehicle preparation center in Brunswick, Georgia. The parties presumed that the damage was caused by exposure to acid rain during transit between the manufacturing plant in Germany and the preparation center.

[2] Dr. Gore also named the German manufacturer and the Birmingham dealership as defendants.

*inter alia*, that the failure to disclose that the car had been repainted constituted suppression of a material fact. [3] The complaint prayed for $ 500,000 in compensatory and punitive damages, and costs.

At trial, BMW acknowledged that it had adopted a nationwide policy in 1983 concerning cars that were damaged in the course of manufacture or transportation. If the cost of repairing the damage exceeded 3 percent of the car's suggested **[*564]** retail price, the car was placed in company service for a period of time and then sold as used. If the repair cost did not exceed 3 percent of the suggested retail price, however, the car was sold as new without advising the dealer that any repairs had been **[****11]** made. Because the $ 601.37 cost of repainting Dr. Gore's car was only about 1.5 percent of its suggested retail price, BMW did not disclose the damage or repair to the Birmingham dealer.

Dr. Gore asserted that his repainted car was worth less than a car that had not been refinished. To prove his actual damages of $ 4,000, he relied on the testimony of a former BMW dealer, who estimated that the value of a repainted BMW was approximately 10 percent less than the value of a new car that had **[***820]** not been damaged and repaired. [4] **[****12]** To support his claim for punitive damages, Dr. Gore introduced evidence that since 1983 BMW had sold 983 refinished cars as new, including 14 in Alabama, without disclosing that the cars had been repainted before sale at a cost of more than $ 300 per vehicle. [5] Using the actual damage estimate of $ 4,000 per vehicle, Dr. Gore argued that a punitive award of $ 4 million would provide an appropriate penalty for selling approximately 1,000 cars for more than they were worth.

In defense of its disclosure policy, BMW argued that it was under no obligation to disclose repairs of minor damage to new cars and that Dr. Gore's car was as good as a car with the original factory finish. It disputed Dr. Gore's assertion that the value of the car was impaired by the repainting and argued that this good-faith belief made a punitive award inappropriate. BMW also maintained that transactions in jurisdictions other than Alabama had no relevance to Dr. Gore's claim.

**[*565]** The jury returned a verdict finding BMW liable for compensatory damages of **[**1594]** $ 4,000. In addition, the jury assessed $ 4 million in punitive damages, based on a determination that the nondisclosure policy constituted "gross, oppressive or malicious" fraud. [6] See *Ala. Code §§ 6-11-20, 6-11-21* (1993).

**[****13]** BMW filed a post-trial motion to set aside the punitive damages award. The company introduced evidence to establish that its nondisclosure policy was consistent with the laws of roughly 25 States defining the disclosure obligations of automobile manufacturers, distributors, and dealers. The most stringent of these statutes required disclosure of repairs costing more than 3 percent of the suggested retail price; none mandated disclosure of less costly repairs. [7] Relying on these statutes, BMW contended that its conduct was lawful in these States and therefore could not provide the basis for an award of punitive damages.

---

[3] Alabama codified its common-law cause of action for fraud in a 1907 statute that is still in effect. *Hackmeyer v. Hackmeyer, 268 Ala. 329, 333, 106 So. 2d 245, 249 (1958)*. The statute provides: "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." *Ala. Code § 6-5-102* (1993); see Ala. Code § 4299 (1907).

[4] The dealer who testified to the reduction in value is the former owner of the Birmingham dealership sued in this action. He sold the dealership approximately one year before the trial.

[5] Dr. Gore did not explain the significance of the $ 300 cutoff.

[6] The jury also found the Birmingham dealership liable for Dr. Gore's compensatory damages and the German manufacturer liable for both the compensatory and punitive damages. The dealership did not appeal the judgment against it. The Alabama Supreme Court held that the trial court did not have jurisdiction over the German manufacturer and therefore reversed the judgment against that defendant.

[7] BMW acknowledged that a Georgia statute enacted *after* Dr. Gore purchased his car would require disclosure of similar repairs to a car before it was sold in Georgia. *Ga. Code Ann. §§ 40-1-5(b)-(e)* (1994).

517 U.S. 559, *565; 116 S. Ct. 1589, **1594; 134 L. Ed. 2d 809, ***820; 1996 U.S. LEXIS 3390, ****13

BMW also drew the court's attention to the fact that its nondisclosure policy had never been adjudged unlawful before this action was filed. Just months before Dr. Gore's case went to [****14] trial, the jury in a similar lawsuit filed by another Alabama BMW purchaser found that BMW's failure to disclose paint repair constituted fraud. *Yates v. BMW of North America, Inc., 642 So. 2d 937 (Ala. 1993).* [8] Before the [*566] judgment in this case, BMW changed its policy by taking steps to avoid the sale of any [***821] refinished vehicles in Alabama and two other States. When the $ 4 million verdict was returned in this case, BMW promptly instituted a nationwide policy of full disclosure of all repairs, no matter how minor.

In response to BMW's arguments, Dr. Gore asserted [****15] that the policy change demonstrated the efficacy of the punitive damages award. He noted that while no jury had held the policy unlawful, BMW had received a number of customer complaints relating to undisclosed repairs and had settled some lawsuits. [9] Finally, he maintained that the disclosure statutes of other States were irrelevant because BMW had failed to offer any evidence that the disclosure statutes supplanted, rather than supplemented, existing causes of action for common-law fraud.

The trial judge denied BMW's post-trial motion, holding, *inter alia,* that the award was not excessive. On appeal, the Alabama Supreme Court also rejected BMW's claim that the award exceeded the constitutionally permissible [****16] amount. *646 So. 2d 619 (1994).* The court's excessiveness inquiry applied the factors articulated in *Green Oil Co. v. Hornsby, 539 So. 2d 218, 223-224 (Ala. 1989),* and approved in *Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21-22, 113 L. Ed. 2d 1, 111 S. Ct. 1032 (1991). 646 So. 2d at 624-625.* Based on its analysis, the court concluded that BMW's conduct was "reprehensible"; the nondisclosure was profitable for the company; the judgment "would not have a substantial impact upon [BMW's] financial position"; the litigation had been expensive; no criminal sanctions had been imposed on BMW for the same conduct; the award of *no* punitive [*567] damages in *Yates* reflected "the inherent uncertainty of the trial process"; and the punitive award bore a "reasonable relationship" to "the harm that [**1595] was likely to occur from [BMW's] conduct as well as . . . the harm that actually occurred." *646 So. 2d at 625-627.*

The Alabama Supreme Court did, however, rule in BMW's favor on one critical point: The court found that the jury improperly computed the amount of punitive damages by multiplying Dr. Gore's compensatory damages by the number of similar sales in other [****17] jurisdictions. *Id., at 627.* Having found the verdict tainted, the court held that "a constitutionally reasonable punitive damages award in this case is $ 2,000,000," *id., at 629,* and therefore ordered a remittitur in that amount. [10] The court's discussion of the amount of its remitted award expressly disclaimed any reliance on "acts that occurred in other jurisdictions"; instead, the court explained that it had used a "comparative analysis" that considered Alabama cases, "along with cases from other jurisdictions, involving the sale of an automobile where the seller misrepresented the condition of the vehicle [***822] and the jury awarded punitive damages to the purchaser." [11] *Id., at 628.*

_____

[8] While awarding a comparable amount of compensatory damages, the *Yates* jury awarded no punitive damages at all. In *Yates,* the plaintiff also relied on the 1983 nondisclosure policy, but instead of offering evidence of 983 repairs costing more than $ 300 each, he introduced a bulk exhibit containing 5,856 repair bills to show that petitioner had sold over 5,800 new BMW vehicles without disclosing that they had been repaired.

[9] Prior to the lawsuits filed by Dr. Yates and Dr. Gore, BMW and various BMW dealers had been sued 14 times concerning presale paint or damage repair. According to the testimony of BMW's in-house counsel at the postjudgment hearing on damages, only one of the suits concerned a car repainted by BMW.

[10] The Alabama Supreme Court did not indicate whether the $ 2 million figure represented the court's independent assessment of the appropriate level of punitive damages, or its determination of the maximum amount that the jury could have awarded consistent with the Due Process Clause.

[11] Other than *Yates v. BMW of North America, Inc., 642 So. 2d 937 (Ala. 1993),* in which no punitive damages were awarded, the Alabama Supreme Court cited no such cases. In another portion of its opinion, *646 So. 2d at 629,* the court did cite five Alabama cases, none of which involved either a dispute arising out of the purchase of an automobile or an award of punitive damages. *G. M. Mosley Contractors, Inc. v. Phillips, 487 So. 2d 876, 879 (Ala. 1986); Hollis v. Wyrosdick, 508 So. 2d 704 (Ala. 1987); Campbell v. Burns, 512 So. 2d 1341, 1343 (Ala. 1987); Ashbee v. Brock, 510 So. 2d 214 (Ala. 1987);* and *Jawad v.*

[****18]  [*568] Because we believed that a review of this case would help to illuminate "the character of the standard that will identify unconstitutionally excessive awards" of punitive damages, see *Honda Motor Co. v. Oberg, 512 U.S. 415, 420, 129 L. Ed. 2d 336, 114 S. Ct. 2331 (1994)*, we granted certiorari, *513 U.S. 1125 (1995)*.

II

[3]Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition. *Gertz v. Robert Welch, Inc., 418 U.S. 323, 350, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974)*; *Newport v. Fact Concerts, Inc., 453 U.S. 247, 266-267, 69 L. Ed. 2d 616, 101 S. Ct. 2748 (1981)*; *Haslip, 499 U.S. at 22*. In our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. Most States that authorize exemplary damages afford the jury similar latitude, requiring only that the damages awarded be reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence. [****19] See *TXO, 509 U.S. at 456*; *Haslip, 499 U.S. at 21, 22*. Only when an award can fairly be categorized as "grossly excessive" in relation to these interests does it enter the zone of arbitrariness that violates the *Due Process Clause of the Fourteenth Amendment*. Cf. *TXO, 509 U.S. at 456*. For that reason, the federal excessiveness inquiry appropriately begins with an identification of the state interests that a punitive award is designed to serve. We therefore focus our attention first on the scope of Alabama's legitimate interests in punishing BMW and deterring it from future misconduct.

[4]No one doubts that a State may protect its citizens by prohibiting deceptive trade practices and by requiring automobile [*569] distributors to disclose presale repairs that affect the [**1596] value of a new car. But the States need not, and in fact do not, provide such protection in a uniform manner. Some States rely on the judicial process to formulate and enforce an appropriate disclosure requirement by applying principles of contract and tort law. [12] Other States have enacted[***823] various forms of legislation that define [****20] the disclosure obligations of automobile manufacturers, distributors, and dealers. [13] [*570] The result is a patchwork of rules representing the diverse policy judgments of lawmakers in 50 States.

---

*Granade, 497 So. 2d 471 (Ala. 1986)*. All of these cases support the proposition that appellate courts in Alabama presume that jury verdicts are correct. In light of the Alabama Supreme Court's conclusion that (1) the jury had computed its award by multiplying $ 4,000 by the number of refinished vehicles sold in the United States and (2) that the award should have been based on Alabama conduct, respect for the error-free portion of the jury verdict would seem to produce an award of $ 56,000 ($ 4,000 multiplied by 14, the number of repainted vehicles sold in Alabama).

[12] See, e. g., *Rivers v. BMW of North America, Inc., 214 Ga. App. 880, 449 S.E.2d 337 (1994)* (nondisclosure of presale paint repairs that occurred before state disclosure statute enacted); *Wedmore v. Jordan Motors, Inc., 589 N.E.2d 1180 (Ind. App. 1992)* (same).

[13] Four States require disclosure of vehicle repairs costing more than 3 percent of suggested retail price. Ariz. Rev. Stat. Ann. § 28-1304.03 (1989); *N. C. Gen. Stat. § 20-305.1(d)(5a)* (1995); *S. C. Code § 56-32-20* (Supp. 1995); *Va. Code Ann. § 46.2-1571(D)* (Supp. 1995). An additional three States mandate disclosure when the cost of repairs exceeds 3 percent or $ 500, whichever is greater. *Ala. Code § 8-19-5(22)(c)* (1993); *Cal. Veh. Code Ann. §§ 9990-9991* (West Supp. 1996); *Okla. Stat., Tit. 47, § 1112.1* (1991). Indiana imposes a 4 percent disclosure threshold. *Ind. Code §§ 9-23-4-4, 9-23-4-5* (1993). Minnesota requires disclosure of repairs costing more than 4 percent of suggested retail price or $ 500, whichever is greater. *Minn. Stat. § 325F.664* (1994). New York requires disclosure when the cost of repairs exceeds 5 percent of suggested retail price. *N. Y. Gen. Bus. Law §§ 396-p(5)(a), (d)* (McKinney Supp. 1996). Vermont imposes a 5 percent disclosure threshold for the first $ 10,000 in repair costs and 2 percent thereafter. *Vt. Stat. Ann., Tit. 9, § 4087(d)* (1993). Eleven States mandate disclosure only of damage costing more than 6 percent of retail value to repair. *Ark. Code Ann. § 23-112-705* (1992); *Idaho Code § 49-1624* (1994); Ill. Comp. Stat., ch. 815, § 710/5 (1994); *Ky. Rev. Stat. Ann. § 190.0491(5)* (Baldwin 1988); *La. Rev. Stat. Ann § 32:1260* (West Supp. 1995); Miss. Motor Vehicle Comm'n, Regulation No. 1 (1992); *N. H. Rev. Stat. Ann. § 357-C:5(III)(d)* (1995); *Ohio Rev. Code Ann. § 4517.61* (1994); *R. I. Gen. Laws §§ 31-5.1-18(d)*, *(f)* (1995); Wis. Stat. § 218.01(2d)(a) (1994); *Wyo. Stat. § 31-16-115* (1994). Two States require disclosure of repairs costing $ 3,000 or more. See *Iowa Code Ann. § 321.69* (Supp. 1996); N. D. Admin. Code § 37-09-01-01 (1992). Georgia mandates disclosure of paint damage that costs more than $ 500 to repair. *Ga. Code Ann. §§ 40-1-5(b)-(e)* (1994) (enacted after respondent purchased his car). Florida requires dealers to disclose paint repair costing more than $ 100 of which they have actual knowledge. *Fla. Stat. § 320.27(9)(n)* (1992). Oregon requires manufacturers

[****21]   That diversity demonstrates that reasonable people may disagree about the value of a full disclosure requirement. Some legislatures may conclude that affirmative disclosure requirements are unnecessary because the self-interest of those involved in the automobile trade in developing and maintaining the goodwill of their customers will motivate them to make voluntary disclosures or to refrain from selling cars that do not comply with self-imposed standards. Those legislatures that do adopt affirmative disclosure obligations may take into account the cost of government regulation, choosing to draw a line exempting minor repairs from such a requirement. In formulating a disclosure standard, States may also consider other goals, such as providing a "safe harbor" for automobile manufacturers, distributors, and dealers against lawsuits over minor repairs. [14]

[****22]   [5][6]We may assume, *arguendo*, that it would be wise for every State to adopt Dr. Gore's preferred rule, requiring full disclosure of every presale repair to a car, no matter how trivial and regardless of its actual impact on the value of the car.  [*571] But while we do not doubt that Congress has ample authority to enact [***824] such a policy for the entire Nation, [15] it [**1597] is clear that no single State could do so, or even impose its own policy choice on neighboring States. See *Bonaparte v. Tax Court, 104 U.S. 592, 594, 26 L. Ed. 845 (1881)* ("No State can legislate except with reference to its own jurisdiction. . . . Each State is independent of all the others in this particular"). [16] Similarly, one State's power to impose burdens on the interstate market for automobiles is not only subordinate to the federal power over interstate commerce, *Gibbons v. Ogden, 22 U.S. 1, 9 Wheat. 1, 194-196, 6 L. Ed. 23 (1824)*, but is also constrained by the need to respect the interests of other States, see, *e. g., Healy v. Beer Institute [****23]  , 491 U.S. 324, 335-336, 105 L. Ed. 2d 275, 109 S. Ct. 2491 (1989)* (the Constitution has a "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on [*572] interstate commerce and with the autonomy of the individual States within their respective spheres" (footnote omitted)); *Edgar v. MITE Corp., 457 U.S. 624, 643, 73 L. Ed. 2d 269, 102 S. Ct. 2629 (1982)*.

[****24]   [7][8A][9][10A]We think it follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States. [17] Before this Court Dr. Gore argued that the large punitive damages award was necessary to induce

---

to disclose all "postmanufacturing" damage and repairs. It is unclear whether this mandate would apply to repairs such as those at issue here. *Ore. Rev. Stat. § 650.155* (1991).

Many, but not all, of the statutes exclude from the computation of repair cost the value of certain components − typically items such as glass, tires, wheels and bumpers -- when they are replaced with identical manufacturer's original equipment. *E. g., Cal. Veh. Code Ann. §§ 9990-9991* (West Supp. 1996); *Ga. Code Ann. §§ 40-1-5(b)-(e)* (1994); Ill. Comp. Stat., ch. 815, § 710/5 (1994); *Ky. Rev. Stat. Ann. § 190.0491(5)* (Baldwin 1988); *Okla. Stat., Tit. 47, § 1112.1* (1991); *Va. Code Ann. § 46.2-1571(D)* (Supp. 1995); *Vt. Stat. Ann., Tit. 9, § 4087(d)* (1993).

[14] Also, a state legislature might plausibly conclude that the administrative costs associated with full disclosure would have the effect of raising car prices to the State's residents.

[15] Federal disclosure requirements are, of course, a familiar part of our law. See, *e. g.,* the Federal Food, Drug, and Cosmetic Act, as added by the Nutrition Labeling and Education Act of 1990, 104 Stat. 2353, *21 U.S.C. § 343*; the Truth In Lending Act, 82 Stat. 148, as amended, *15 U.S.C. § 1604*; the Securities Exchange Act of 1934, 48 Stat. 892, 894, as amended, *15 U.S.C. §§ 78l-78m*; Federal Cigarette Labeling and Advertising Act, 79 Stat. 283, as amended, *15 U.S.C. § 1333*; Alcoholic Beverage Labeling Act of 1988, 102 Stat. 4519, *27 U.S.C. § 215*.

[16] See also *Bigelow v. Virginia, 421 U.S. 809, 824, 44 L. Ed. 600, 95 S. Ct. 2222 (1975)* ("A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State"); *New York Life Ins. Co. v. Head, 234 U.S. 149, 161, 58 L. Ed. 1259, 34 S. Ct. 879 (1914)* ("It would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State . . . without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends. This is so obviously the necessary result of the Constitution that it has rarely been called in question and hence authorities directly dealing with it do not abound"); *Huntington v. Attrill, 146 U.S. 657, 669, 36 L. Ed. 1123, 13 S. Ct. 224 (1892)* ("Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of other States").

BMW to change the nationwide policy that it adopted in 1983. [18] [****26] But by attempting to alter BMW's nationwide policy, Alabama would be infringing on the policy [***825] choices of other States. To avoid such encroachment, the economic penalties that a State such as Alabama inflicts on those who transgress its laws, whether the penalties take the form of legislatively authorized fines or judicially imposed punitive damages, must be supported by the State's interest in protecting its own consumers and its own economy. Alabama may insist that BMW adhere to a particular disclosure [****25] policy in that State. Alabama does not [*573] have the power, however, to punish BMW for conduct that was lawful where it occurred and that had no impact on Alabama or its residents. [19] [**1598] Nor may Alabama impose sanctions on BMW in order to deter conduct that is lawful in other jurisdictions.

[8B] [10B]

[****27]   [11A][12A]In this case, we accept the Alabama Supreme Court's interpretation of the jury verdict as reflecting a computation of the amount of punitive damages "based in large part on conduct that happened in other jurisdictions." _646 So. 2d at 627_.As the Alabama Supreme Court noted, neither the jury nor the trial court was presented with evidence that any of BMW's out-of-state conduct was unlawful. "The only testimony touching the issue showed that approximately 60% of the vehicles that were refinished were sold in states where failure to disclose the repair was not an unfair trade practice." _Id., at 627, n. 6_. [20] The Alabama Supreme Court therefore properly eschewed reliance on BMW's out-of-state conduct, _id., at 628_, and based its remitted award solely on [*574] conduct that occurred within Alabama. [21] The award must be analyzed in the light of the same conduct, with consideration given only to the interests of Alabama consumers, rather than those of the entire Nation. When the scope of the interest in punishment [****28] and deterrence that an Alabama court may appropriately consider

---

[17] State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute. See _New York Times Co. v. Sullivan, 376 U.S. 254, 265, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)_ ("The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised"); _San Diego Building Trades Council v. Garmon, 359 U.S. 236, 247, 3 L. Ed. 2d 775, 79 S. Ct. 773 (1959)_ ("Regulation can be as effectively exerted through an award of damages as through some form of preventive relief").

[18] Brief for Respondent 11-12, 23, 27-28; Tr. of Oral Arg. 50-54. Dr. Gore's interest in altering the nationwide policy stems from his concern that BMW would not (or could not) discontinue the policy in Alabama alone. Brief for Respondent 11. "If Alabama were limited to imposing punitive damages based only on BMW's gain from fraudulent sales in Alabama, the resulting award would have no prospect of protecting Alabama consumers from fraud, as it would provide no incentive for BMW to alter the unitary, national policy of nondisclosure which yielded BMW millions of dollars in profits." _Id., at 23_. The record discloses no basis for Dr. Gore's contention that BMW could not comply with Alabama's law without changing its nationwide policy.

[19] See _Bordenkircher v. Hayes, 434 U.S. 357, 363, 54 L. Ed. 2d 604, 98 S. Ct. 663 (1978)_ ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort"). Our cases concerning recidivist statutes are not to the contrary. Habitual offender statutes permit the sentencing court to enhance a defendant's punishment for a crime in light of prior convictions, including convictions in foreign jurisdictions. See _e. g._, _Ala. Code § 13A-5-9_ (1994); _Cal. Penal Code Ann. §§ 667.5(f)_, _668_ (West Supp. 1996); Ill. Comp. Stat., ch. 720, § 5/33B-1 (1994); _N. Y. Penal Law §§ 70.04, 70.06, 70.08, 70.10_ (McKinney 1987 and Supp. 1996); _Tex. Penal Code Ann. § 12.42_ (1994 and Supp. 1995-1996). A sentencing judge may even consider past criminal behavior which did not result in a conviction and lawful conduct that bears on the defendant's character and prospects for rehabilitation. _Williams v. New York, 337 U.S. 241, 93 L. Ed. 1337, 69 S. Ct. 1079 (1949)_. But we have never held that a sentencing court could properly _punish_ lawful conduct. This distinction is precisely the one we draw here. See n. 21, _infra_.

[20] Given that the verdict was based in part on out-of-state conduct that was lawful where it occurred, we need not consider whether one State may properly attempt to change a tortfeasor's _unlawful_ conduct in another State.

[21] Of course, the fact that the Alabama Supreme Court correctly concluded that it was error for the jury to use the number of sales in other States as a multiplier in computing the amount of its punitive sanction does not mean that evidence describing out-of-state transactions is irrelevant in a case of this kind. To the contrary, as we stated in _TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 462, n. 28, 125 L. Ed. 2d 366, 113 S. Ct. 2711 (1993)_, such evidence may be relevant to the determination of the degree of reprehensibility of the defendant's conduct.

is properly limited, it is apparent -- for [***826] reasons that we shall now address -- that this award is grossly excessive.

[11B] [12B]

[****29]  III

[1B][13][14A]Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose. [22]Three guideposts, each of which indicates that BMW did not receive adequate notice of the magnitude of the sanction that Alabama might impose for adhering to the nondisclosure policy adopted in 1983, lead us to the conclusion that [*575] the $ 2 million award against BMW is grossly excessive: the degree of reprehensibility of the nondisclosure; the disparity between the harm or potential harm suffered by Dr. Gore and his punitive damages award; and the difference between this remedy and the civil penalties authorized [**1599] or imposed in comparable cases. We discuss these considerations in turn.

[14B]

[****30]  *Degree of Reprehensibility*

[15][16][17]Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. [23] As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect "the enormity of his offense." *Day v. Woodworth, 54 U.S. 363, 13 HOW 363, 371, 14 L. Ed. 181 (1852)*. See also *St. Louis, I. M. & S. R. Co. v. Williams, 251 U.S. 63, 66-67, 64 L. Ed. 139, 40 S. Ct. 71 (1919)* (punitive award may not be "wholly disproportioned to the offense"); *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301, 106 L. Ed. 2d 219, 109 S. Ct. 2909 (1989)* (O'CONNOR, J., concurring in part and dissenting in part) (reviewing court "should examine the gravity of the defendant's conduct and the harshness of the award of punitive damages"). [24] [****31] This principle reflects the accepted view that some wrongs are more [****31] blameworthy than others. Thus, we have said that [*576] "nonviolent crimes are less serious than crimes marked by violence or the [***827] threat of violence." *Solem v. Helm, 463 U.S. 277, 292-293, 77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983)*. Similarly, "trickery and deceit," *TXO, 509 U.S. at 462*, are more reprehensible than negligence. In *TXO*, both the West Virginia Supreme Court and the Justices of this Court placed

---

[22] See *Miller v. Florida, 482 U.S. 423, 96 L. Ed. 2d 351, 107 S. Ct. 2446 (1987)* (*Ex Post Facto* Clause violated by retroactive imposition of revised sentencing guidelines that provided longer sentence for defendant's crime); *Bouie v. City of Columbia, 378 U.S. 347, 12 L. Ed. 2d 894, 84 S. Ct. 1697 (1964)* (retroactive application of new construction of statute violated due process); *id., at 350-355* (citing cases); *Lankford v. Idaho, 500 U.S. 110, 114 L. Ed. 2d 173, 111 S. Ct. 1723 (1991)* (due process violated because defendant and his counsel did not have adequate notice that judge might impose death sentence). The strict constitutional safeguards afforded to criminal defendants are not applicable to civil cases, but the basic protection against "judgments without notice" afforded by the Due Process Clause, *Shaffer v. Heitner, 433 U.S. 186, 217, 53 L. Ed. 2d 683, 97 S. Ct. 2569 (1977)* (STEVENS, J., concurring in judgment), is implicated by civil *penalties*.

[23] "The flagrancy of the misconduct is thought to be the primary consideration in determining the amount of punitive damages." Owen, A Punitive Damages Overview: Functions, Problems and Reform, *39 Vill. L. Rev. 363, 387 (1994)*.

[24] The principle that punishment should fit the crime "is deeply rooted and frequently repeated in common-law jurisprudence." *Solem v. Helm, 463 U.S. 277, 284, 77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983)*. See *Burkett v. Lanata, 15 La. Ann. 337, 339 (1860)* (punitive damages should be "commensurate to the nature of the offence"); *Blanchard v. Morris, 15 Ill. 35, 36 (1853)* ("We cannot say [the exemplary damages] are excessive under the circumstances; for the proofs show that threats, violence, and imprisonment, were accompanied by mental fear, torture, and agony of mind"); *Louisville & Northern R. Co. v. Brown, 127 Ky. 732, 749, 106 S.W. 795, 799 (1908)* ("We are not aware of any case in which the court has sustained a verdict as large as this one unless the injuries were permanent").

517 U.S. 559, *576; 116 S. Ct. 1589, **1599; 134 L. Ed. 2d 809, ***827; 1996 U.S. LEXIS 3390, ****31

special emphasis on the principle that punitive damages may not be "grossly out of proportion to the severity of the offense." [25] *Id., at 453, 462.* Indeed, for JUSTICE KENNEDY, the defendant's intentional malice was the decisive element in a "close and difficult" case. *Id., at 468.* [26]

[1C] [18]In this case, none of the aggravating factors associated with particularly reprehensible conduct is present. The harm BMW inflicted on Dr. Gore was purely economic in nature. The presale refinishing of the car had no effect on its performance or safety features, or even its appearance for at least nine months after his purchase. BMW's conduct evinced no indifference to or reckless disregard for the health and safety of others. To be sure, infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, *id., at 453,* or when the target is financially vulnerable, can warrant a substantial penalty. But this observation does not convert [****33] all acts that cause economic harm into torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages.

[19]Dr. Gore contends that BMW's conduct was particularly reprehensible because nondisclosure of the repairs to his car formed part of a nationwide pattern of tortious conduct. Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument [*577] that strong medicine is required to cure the defendant's disrespect for the law. See *id., at 462, n. 28.* Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more [**1600] reprehensible than an individual instance of malfeasance. See *Gryger v. Burke, 334 U.S. 728, 732, 92 L. Ed. 1683, 68 S. Ct. 1256 (1948).*

In support of his thesis, Dr. Gore advances two arguments. First, he asserts that the state disclosure statutes supplement, rather than supplant, existing remedies for breach of contract and common-law fraud. Thus, according [****34] to Dr. Gore, the statutes may not properly be viewed as immunizing from liability the nondisclosure of repairs costing less than the applicable statutory threshold. Brief for Respondent 18-19. Second, Dr. Gore maintains that BMW should have anticipated that its failure to disclose similar repair work could expose it to liability for fraud. *Id., at 4-5.*

[1D] [20]We recognize, of course, that only state courts may authoritatively construe state statutes. As far as we are aware, at the time this action was commenced no state court had explicitly addressed whether its State's disclosure statute provides a safe harbor for nondisclosure of presumptively [***828] minor repairs or should be construed instead as supplementing common-law duties. [27] [****36] A review of the text of the statutes, [*578]

------

[25] *Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 22, 113 L. Ed. 2d 1, 111 S. Ct. 1032 (1991).*

[26] The dissenters also recognized that "TXO's conduct was clearly wrongful, calculated, and improper . . . ." *TXO, 509 U.S. at 482* (opinion of O'CONNOR, J.).

[27] In *Jeter v. M & M Dodge, Inc., 634 So. 2d 1383 (La. App. 1994),* a Louisiana court of appeals suggested that the Louisiana disclosure statute functions as a safe harbor. Finding that the cost of repairing presale damage to the plaintiff's car exceeded the statutory disclosure threshold, the court held that the disclosure statute did not provide a defense to the action. *Id., at 1384.*

During the pendency of this litigation, Alabama enacted a disclosure statute which defines "material" damage to a new car as damage requiring repairs costing in excess of 3 percent of suggested retail price or $ 500, whichever is greater. *Ala. Code § 8-19-5(22)* (1993). After its decision in this case, the Alabama Supreme Court stated in dicta that the remedies available under this section of its Deceptive Trade Practices Act did not displace or alter pre-existing remedies available under either the common law or other statutes. *Hines v. Riverside Chevrolet-Olds, Inc., 655 So. 2d 909, 917, n. 2 (1994).* It refused, however, to "recognize, or impose on automobile manufacturers, a general duty to disclose every repair of damage, however slight, incurred during the manufacturing process." *Id., at 921.* Instead, it held that whether a defendant has a duty to disclose is a question of fact "for the jury to determine." *Id., at 918.* In reaching that conclusion it overruled two earlier decisions that seemed to indicate that as a matter of law there was no disclosure obligation in cases comparable to this one. *Id., at 920* (overruling *Century 21-Reeves Realty, Inc. v. McConnell Cadillac, Inc., 626 So. 2d 1273 (Ala. 1993),* and *Cobb v. Southeast Toyota Distributors, Inc., 569 So. 2d 395 (Ala. 1990)).*

517 U.S. 559, *578; 116 S. Ct. 1589, **1600; 134 L. Ed. 2d 809, ***828; 1996 U.S. LEXIS 3390, ****36

however, persuades us that in the absence of a state-court determination to the contrary, a corporate executive could reasonably interpret the disclosure requirements as establishing safe harbors. In California, for example, the disclosure statute defines "material" [****35] damage to a motor vehicle as damage requiring repairs costing in excess of 3 percent of the suggested retail price or $ 500, whichever is greater. _Cal. Veh. Code Ann. § 9990_ (West Supp. 1996). The Illinois statute states that in cases in which disclosure is not required, "nondisclosure does not constitute a misrepresentation or omission of fact." Ill. Comp. Stat., ch. 815, § 710/5 (1994). [28] Perhaps the statutes may also be interpreted in another way. We simply emphasize that the record contains no evidence that BMW's decision to follow a disclosure policy that coincided with the strictest extant state statute was sufficiently reprehensible to justify a $ 2 million award of punitive damages.

[*579]  [1E] [21]Dr. Gore's second argument [****37] for treating BMW as a recidivist is that the company should have anticipated that its actions would be considered fraudulent in some, if not all, jurisdictions.  This contention overlooks the fact that actionable fraud requires a _material_ [**1601] misrepresentation or omission. [29] [****38] This qualifier invites line-drawing of just the sort engaged in by States with disclosure statutes and by BMW. We do not think it can be disputed that there may exist minor imperfections in the finish of a new car that can be repaired (or indeed, left unrepaired)  [***829] without materially affecting the car's value. [30] There is no evidence that BMW acted in bad faith when it sought to establish the appropriate line between presumptively minor damage and damage requiring disclosure to purchasers. For this purpose, BMW could reasonably rely on state disclosure statutes for guidance. In this regard, it is also significant that there is no evidence that BMW persisted in a course of conduct after it had been adjudged unlawful on even one occasion, let alone repeated occasions. [31]

[1F]Finally, the record in this case discloses no deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive, such as were present in _Haslip and TXO. Haslip, 499 U.S. at 5_;_TXO, 509 U.S. at 453_. We accept, of course, the jury's finding that BMW suppressed [*580] a material [****39] fact which Alabama law obligated it to communicate to prospective purchasers of repainted cars in that State. But the omission of a material fact may be less reprehensible than a deliberate false statement, particularly when there is a good-faith basis for believing that no duty to disclose exists.

[22]That conduct is sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages does not establish the high degree of culpability that warrants a substantial punitive damages award. Because this case exhibits none of the circumstances ordinarily associated with egregiously improper conduct, we are persuaded that BMW's conduct was not sufficiently reprehensible to warrant imposition of a $ 2 million exemplary damages award.

---

[28] See also Ariz. Rev. Stat. Ann. § 28-1304.03 (1989) ("If disclosure is not required under this section, a purchaser may not revoke or rescind a sales contract due solely to the fact that the new motor vehicle was damaged and repaired prior to completion of the sale"); _Ind. Code § 9-23-4-5_ (1993) (providing that "repaired damage to a customer-ordered new motor vehicle not exceeding four percent (4%) of the manufacturer's suggested retail price does not need to be disclosed at the time of sale"); _N. C. Gen. Stat. § 20-305.1(e)_ (1993) (requiring disclosure of repairs costing more than 5 percent of suggested retail price and prohibiting revocation or rescission of sales contract on the basis of less costly repairs); _Okla. Stat., Tit. 47, § 1112.1_ (1991) (defining "material" damage to a car as damage requiring repairs costing in excess of 3 percent of suggested retail price or $ 500, whichever is greater).

[29] _Restatement (Second) of Torts § 538_ (1977); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 108 (5th ed. 1984).

[30] The Alabama Supreme Court has held that a car may be considered "new" as a matter of law even if its finish contains minor cosmetic flaws.  _Wilburn v. Larry Savage Chevrolet, Inc., 477 So. 2d 384 (1985)._ We note also that at trial respondent only introduced evidence of undisclosed paint damage to new cars repaired at a cost of $ 300 or more. This decision suggests that respondent believed that the jury might consider some repairs too _de minimis_ to warrant disclosure.

[31] Before the verdict in this case, BMW had changed its policy with respect to Alabama and two other States. Five days after the jury award, BMW altered its nationwide policy to one of full disclosure.

517 U.S. 559, *580; 116 S. Ct. 1589, **1601; 134 L. Ed. 2d 809, ***829; 1996 U.S. LEXIS 3390, ****39

*Ratio*

The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff. See *TXO, 509 U.S. at 459; Haslip, 499 U.S. at 23*. The principle that exemplary damages must bear a "reasonable relationship" to compensatory damages has a long pedigree. **[****40]** [32] **[****41]** Scholars have identified a number of early English statutes authorizing the **[*581]** award of multiple **[***830]** damages for particular wrongs. Some 65 different enactments during the period between 1275 and 1753 provided for double, treble, or quadruple damages. [33] Our **[**1602]** decisions in both *Haslip* and *TXO* endorsed the proposition that a comparison between the compensatory award and the punitive award is significant.

In *Haslip* we concluded that even though a punitive damages award of "more than 4 times the amount of compensatory damages" might be "close to the line," it did not "cross the line into the area of constitutional impropriety." *499 U.S. at 23-24*. *TXO*, following dicta in *Haslip*, **[****42]** refined this analysis by confirming that the proper inquiry is "whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred.'" *TXO, 509 U.S. at 460* (emphasis in original), quoting *Haslip, 499 U.S. at 21*. Thus, in upholding the $ 10 million award in *TXO*, we relied on the difference between that figure and the harm to the victim that would have ensued if the tortious plan had succeeded. That difference suggested that the relevant ratio was not more than 10 to 1. [34]

**[****43]**

**[*582]** [1G]The $ 2 million in punitive damages awarded to Dr. Gore by the Alabama Supreme Court is 500 times the amount of his actual harm as determined by the jury. [35] Moreover, there is no suggestion that Dr. Gore or any

---

[32] See, e. g., *Grant v. McDonogh, 7 La. Ann. 447, 448 (1852)* ("Exemplary damages allowed should bear some proportion to the real damage sustained"); *Saunders v. Mullen, 66 Iowa 728, 729, 24 N.W. 529 (1885)* ("When the actual damages are so small, the amount allowed as exemplary damages should not be so large"); *Flannery* v. *Baltimore & Ohio R. Co.*, 15 D. C. 111, 125 (1885) (when punitive damages award "is out of all proportion to the injuries received, we feel it our duty to interfere"); *Houston & Texas Central R. Co.* v. *Nichols*, 9 Am. & Eng. R. R. Cas. 361, 365 (Tex. 1882) ("Exemplary damages, when allowed, should bear proportion to the actual damages sustained"); *McCarthy v. Niskern, 22 Minn. 90, 91-92 (1875)* (punitive damages "enormously in excess of what may justly be regarded as compensation" for the injury must be set aside "to prevent injustice").

[33] Owen, *supra* n. 23, at 368, and n. 23. One English statute, for example, provides that officers arresting persons out of their jurisdiction shall pay double damages. 3 Edw., I., ch. 35. Another directs that in an action for forcible entry or detainer, the plaintiff shall recover treble damages. 8 Hen. VI, ch. 9, § 6.

Present-day federal law allows or mandates imposition of multiple damages for a wide assortment of offenses, including violations of the antitrust laws, see § 4 of the Clayton Act, 38 Stat. 731, as amended, *15 U.S.C. § 15*, and the Racketeer Influenced and Corrupt Organizations Act, see *18 U.S.C. § 1964*, and certain breaches of the trademark laws, see § 35 of the Trademark Act of 1946, 60 Stat. 439, as amended, *15 U.S.C. § 1117*, and the patent laws, see 66 Stat. 813, *35 U.S.C. § 284*.

[34] "While petitioner stresses the shocking disparity between the punitive award and the compensatory award, that shock dissipates when one considers the potential loss to respondents, in terms of reduced or eliminated royalties payments, had petitioner succeeded in its illicit scheme. Thus, even if the actual value of the 'potential harm' to respondents is not between $ 5 million and $ 8.3 million, but is closer to $ 4 million, or $ 2 million, or even $ 1 million, the disparity between the punitive award and the potential harm does not, in our view, 'jar one's constitutional sensibilities.'" *TXO, 509 U.S. at 462*, quoting *Haslip, 499 U.S. at 18*.

[35] Even assuming each repainted BMW suffers a diminution in value of approximately $ 4,000, the award is 35 times greater than the total damages of all 14 Alabama consumers who purchased repainted BMW's.

517 U.S. 559, *582; 116 S. Ct. 1589, **1602; 134 L. Ed. 2d 809, ***830; 1996 U.S. LEXIS 3390, ****43

other BMW purchaser was threatened with any additional potential harm by BMW's nondisclosure policy. The disparity in this case is thus dramatically greater than those considered in *Haslip* and *TXO*. [36]

[23]Of [****44] course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* [***831] damages to the punitive award. *TXO, 509 U.S. at 458*. [37] Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once again, "we return to what we said . . . in *Haslip*: 'We need not, and, [*583] indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus.'" *Id., at 458* (quoting *Haslip, 499 U.S. at [**1603] 18*). In most cases, the ratio will be within a constitutionally acceptable range, [****45] and remittitur will not be justified on this basis. When the ratio is a breathtaking 500 to 1, however, the award must surely "raise a suspicious judicial eyebrow." *TXO, 509 U.S. at 481* (O'CONNOR, J., dissenting).

### Sanctions for Comparable Misconduct

[1H][24]Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides [****46] a third indicium of excessiveness. As JUSTICE O'CONNOR has correctly observed, a reviewing court engaged in determining whether an award of punitive damages is excessive should "accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue." *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. at 301* (opinion concurring in part and dissenting in part). In *Haslip, 499 U.S. at 23*, the Court noted that although the exemplary award was "much in excess of the fine that could be imposed," imprisonment was also authorized in the criminal context. [38] In this [*584] case the $ 2 million economic sanction imposed on BMW is substantially greater than the statutory fines available in Alabama and elsewhere for similar malfeasance.

[****47] [***832]   The maximum civil penalty authorized by the Alabama Legislature for a violation of its Deceptive Trade Practices Act is $ 2,000; [39] other States authorize more severe sanctions, with the maxima ranging from $ 5,000 to $ 10,000. [40] Significantly, some statutes draw a distinction between first offenders and

---

[36] The ratio here is also dramatically greater than any award that would be permissible under the statutes and proposed statutes summarized in the appendix to JUSTICE GINSBURG's dissenting opinion. *Post*, at 615-616.

[37] Conceivably the Alabama Supreme Court's selection of a 500-to-1 ratio was an application of JUSTICE SCALIA's identification of one possible reading of the plurality opinion in *TXO*: Any future due process challenge to a punitive damages award could be disposed of with the simple observation that "this is no worse than *TXO*." *509 U.S. at 472* (SCALIA, J., concurring in judgment). As we explain in the text, this award is significantly worse than the award in *TXO*.

[38] Although the Court did not address the size of the punitive damages award in *Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 78 L. Ed. 2d 443, 104 S. Ct. 615 (1984)*, the dissenters commented on its excessive character, noting that the "$ 10 million [punitive damages award] that the jury imposed is 100 times greater than the maximum fine that may be imposed . . . for a single violation of federal standards" and "more than 10 times greater than the largest single fine that the Commission has ever imposed." *Id., at 263* (BLACKMUN, J., dissenting). In *New York Times Co. v. Sullivan, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)*, the Court observed that the punitive award for libel was "one thousand times greater than the maximum fine provided by the Alabama criminal statute," and concluded that the "fear of damage awards under a rule such as that invoked by the Alabama courts here may be markedly more inhibiting than the fear of prosecution under a criminal statute." *Id., at 277*.

[39] *Ala. Code § 8-19-11(b)* (1993).

517 U.S. 559, *584; 116 S. Ct. 1589, **1603; 134 L. Ed. 2d 809, ***832; 1996 U.S. LEXIS 3390, ****47

recidivists; thus, in New York the penalty is $ 50 for a first offense and $ 250 for subsequent offenses. None of these statutes would provide an out-of-state distributor with fair notice that the first violation -- or, indeed the first 14 violations -- of its provisions might subject an offender to a multimillion dollar penalty. Moreover, at the time BMW's policy was first challenged, there does not appear to have been any judicial decision in Alabama or elsewhere indicating that application of that policy might give rise to such severe punishment.

[****48]    [1I]The sanction imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal. The fact that a multimillion dollar penalty prompted a change in policy sheds no light on the question whether a lesser deterrent would have adequately protected the interests of Alabama consumers. In [*585] the absence of a history of noncompliance with known statutory requirements, there is no basis for assuming that a more modest sanction would not have been sufficient to motivate full compliance with the disclosure requirement imposed [**1604] by the Alabama Supreme Court in this case.

IV

[1J]We assume, as the juries in this case and in the *Yates* case found, that the undisclosed damage to the new BMW's affected their actual value. Notwithstanding the evidence adduced by BMW in an effort to prove that the repainted cars conformed to the same quality standards as its other cars, we also assume that it knew, or should have known, [****49] that as time passed the repainted cars would lose their attractive appearance more rapidly than other BMW's. Moreover, we of course accept the Alabama courts' view that the state interest in protecting its citizens from deceptive trade practices justifies a sanction in addition to the recovery of compensatory damages. We cannot, however, accept the conclusion of the Alabama Supreme Court that BMW's conduct was sufficiently egregious to justify a punitive sanction that is tantamount to a severe criminal penalty.

[1K] [25] [26]The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business. Indeed, its status as an active participant in the national economy implicates the federal interest in preventing individual States from imposing undue burdens on interstate commerce. While each State [***833] has ample power to protect its own consumers, [****50] none may use the punitive damages deterrent as a means of imposing its regulatory policies on the entire Nation.

[27A] [28]As in *Haslip*, we are not prepared to draw a bright line marking the limits of a constitutionally acceptable punitive damages award. Unlike that case, however, we are fully convinced that the grossly excessive award imposed in this [*586] case transcends the constitutional limit. 41 Whether the appropriate remedy requires a new trial or merely an independent determination by the Alabama Supreme Court of the award necessary to vindicate the economic interests of Alabama consumers is a matter that should be addressed by the state court in the first instance.

[27B]

---

40 See, e. g., *Ark. Code Ann. § 23-112-309(b)* (1992) (up to $ 5,000 for violation of state Motor Vehicle Commission Act that would allow suspension of dealer's license; up to $ 10,000 for violation of Act that would allow revocation of dealer's license); *Fla. Stat. § 320.27(12)* (1992) (up to $ 1,000); *Ga. Code Ann. §§ 40-1-5(g)*, *10-1-397(a)* (1994 and Supp. 1996) (up to $ 2,000 administratively; up to $ 5,000 in superior court); *Ind. Code § 9-23-6-4* (1993) ($ 50 to $ 1,000); *N. H. Rev. Stat. Ann. §§ 357-C:15*, *651:2* (1995 and Supp. 1995) (corporate fine of up to $ 20,000); *N. Y. Gen. Bus. Law § 396-p(6)* (McKinney Supp. 1995) ($ 50 for first offense; $ 250 for subsequent offenses).

41 JUSTICE GINSBURG expresses concern that we are "the *only* federal court policing" this limit. *Post*, at 613. The small number of punitive damages questions that we have reviewed in recent years, together with the fact that this is the first case in decades in which we have found that a punitive damages award exceeds the constitutional limit, indicates that this concern is at best premature. In any event, this consideration surely does not justify an abdication of our responsibility to enforce constitutional protections in an extraordinary case such as this one.

**[****51]** The judgment is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

**Concur by:** BREYER

# Concur

JUSTICE BREYER, with whom JUSTICE **O'CONNOR** and JUSTICE **SOUTER** join, concurring.

The Alabama state courts have assessed the defendant $ 2 million in "punitive damages" for having knowingly failed to tell a BMW automobile buyer that, at a cost of $ 600, it had repainted portions of his new $ 40,000 car, thereby lowering its potential resale value by about 10%. The Court's opinion, which I join, explains why we have concluded that this award, in this case, was "grossly excessive" in relation to legitimate punitive damages objectives, and hence an arbitrary deprivation of life, liberty, or property in violation of the Due Process Clause. See *TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 453, 454, 125 L. Ed. 2d 366, 113 S. Ct. 2711 (1993)* (A "grossly excessive" punitive award amounts to an "arbitrary deprivation of property without due process of law") (plurality opinion). Members of this Court have generally thought, however, that if "fair procedures were followed, a judgment that is a product of that process **[****52]** is entitled to a strong presumption **[*587]** of validity." *Id., at 457.* See also *Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 40-42, 113 L. Ed. 2d 1, 111 S. Ct. 1032 (1991)* (KENNEDY, J., concurring in judgment). And the Court also has found that punitive damages procedures very similar to those followed here were not, by themselves, fundamentally unfair. *Id., at 15-24.* Thus, I believe it important to explain why this presumption of validity is overcome in this instance.

**[**1605]** The reason flows from the Court's emphasis in *Haslip* upon the constitutional importance of legal standards that provide "reasonable constraints" within which "discretion is exercised," that assure "meaningful and adequate review by the trial court whenever a jury has fixed the punitive damages," and permit "appellate **[***834]** review [that] makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Id., at 20-21.* See also *id., at 18* ("Unlimited jury discretion -- or unlimited judicial discretion for that matter -- in the fixing of punitive damages may invite extreme results that **[****53]** jar one's constitutional sensibilities").

This constitutional concern, itself harkening back to the Magna Carta, arises out of the basic unfairness of depriving citizens of life, liberty, or property, through the application, not of law and legal processes, but of arbitrary coercion. *Daniels v. Williams, 474 U.S. 327, 331, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986); Dent v. West Virginia, 129 U.S. 114, 123, 32 L. Ed. 623, 9 S. Ct. 231 (1889).* Requiring the application of law, rather than a decisionmaker's caprice, does more than simply provide citizens notice of what actions may subject them to punishment; it also helps to assure the uniform general treatment of similarly situated persons that is the essence of law itself. See *Railway Express Agency, Inc. v. New York, 336 U.S. 106, 112, 93 L. Ed. 533, 69 S. Ct. 463 (1949)* (Jackson, J., concurring) ("There is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally").

**[*588]** Legal standards need not be precise in order to satisfy this constitutional concern. See **[****54]** *Haslip, supra, at 20* (comparing punitive damages standards to such legal standards as "reasonable care," "due diligence," and "best interests of the child") (internal quotation marks omitted). But they must offer some kind of constraint upon a jury or court's discretion, and thus protection against purely arbitrary behavior. The standards the Alabama courts applied here are vague and open ended to the point where they risk arbitrary results. In my view, although the vagueness of those standards does not, by itself, violate due process, see *Haslip, supra,* it does invite the kind of scrutiny the Court has given the particular verdict before us. See *id., at 18* ("Concerns of . . . adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus"); *TXO, supra, at 475* ("It cannot be denied that the lack of clear guidance heightens the risk that arbitrariness, passion, or bias will replace

517 U.S. 559, *588; 116 S. Ct. 1589, **1605; 134 L. Ed. 2d 809, ***834; 1996 U.S. LEXIS 3390, ****54

dispassionate deliberation as the basis for the jury's verdict") (O'CONNOR, J., dissenting). This is because the standards, as the Alabama Supreme Court authoritatively interpreted them here, provided no significant constraints or protection [****55] against arbitrary results.

First, the Alabama statute that permits punitive damages does not itself contain a standard that readily distinguishes between conduct warranting very small, and conduct warranting very large, punitive damages awards. That statute permits punitive damages in cases of "oppression, fraud, wantonness, or malice." *Ala. Code § 6-11-20(a)* (1993). But the statute goes on to define those terms broadly, to encompass far more than the egregious conduct that those terms, at first reading, might seem to imply. An intentional misrepresentation, made through a statement or [***835] silence, can easily amount to "fraud" sufficient to warrant punitive damages. See *§ 6-11-20(b)(1)* ("Fraud" includes "intentional . . . concealment of a material fact the concealing party had a [*589] duty to disclose, which was gross, *oppressive, or malicious* and committed with the intention . . . of thereby depriving a person or entity of property") (emphasis added); *§ 6-11-20(b)(2)* ("Malice" includes *any "wrongful act without* just cause or *excuse . . . with an intent to injure* the . . . *property* of another") (emphasis added); *§ 6-11-20(b)(5)* ("Oppression" includes "subjecting [****56] a person to . . . unjust hardship in conscious disregard of that person's rights"). The statute thereby authorizes punitive damages for the most [**1606] serious kinds of misrepresentations, say, tricking the elderly out of their life savings, for much less serious conduct, such as the failure to disclose repainting a car, at issue here, and for a vast range of conduct in between.

 Second, the Alabama courts, in this case, have applied the "factors" intended to constrain punitive damages awards in a way that belies that purpose. *Green Oil Co. v. Hornsby, 539 So. 2d 218 (Ala. 1989)*, sets forth seven factors that appellate courts use to determine whether or not a jury award is "grossly excessive" and which, in principle, might make up for the lack of significant constraint in the statute. But, as the Alabama courts have authoritatively interpreted them, and as their application in this case illustrates, they impose little actual constraint.

(a) *Green Oil* requires that a punitive damages award "bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred." *Id., at 223*. But this standard does [****57] little to guide a determination of what counts as a "reasonable" relationship, as this case illustrates. The record evidence of past, present, or likely future harm consists of (a) $ 4,000 of harm to Dr. Gore's BMW; (b) 13 other similar Alabama instances; and (c) references to about 1,000 similar instances in other States. The Alabama Supreme Court, disregarding BMW's failure to make relevant objection to the out-of-state instances at trial (as was the court's right), held that the last mentioned, out-of-state instances did *not* [*590] count as relevant harm. It went on to find "a reasonable relationship" between the harm and the $ 2 million punitive damages award *without "considering those acts that occurred in other jurisdictions." 646 So. 2d 619, 628 (1995)* (emphasis added). For reasons explored by the majority in greater depth, see *ante*, at 574-586, the relationship between this award and the underlying conduct seems well beyond the bounds of the "reasonable." To find a "reasonable relationship" between purely economic harm totaling $ 56,000, without significant evidence of future repetition, and a punitive award of $ 2 million is to empty the "reasonable relationship" [****58] test of meaningful content. As thus construed, it does not set forth a legal standard that could have significantly constrained the discretion of Alabama factfinders.

(b) *Green Oil*'s second factor is the "degree of reprehensibility" of the defendant's conduct. *Green Oil, supra, at 223*. Like the "reasonable relationship" test, this factor provides little guidance on how to relate culpability to the size of an award. The Alabama court, in considering this factor, found "reprehensible" that BMW [***836] followed a conscious policy of not disclosing repairs to new cars when the cost of repairs amounted to less than 3% of the car's value. Of course, *any* conscious policy of not disclosing a repair -- where one knows the nondisclosure might cost the customer resale value -- is "reprehensible" to *some* degree. But, for the reasons discussed by the majority, *ante*, at 575-580, I do not see how the Alabama courts could find conduct that (they assumed) caused $ 56,000 of relevant economic harm *especially* or *unusually* reprehensible enough to warrant $ 2 million in punitive damages, or a significant portion of that award. To find to the contrary, as the Alabama courts did, is [****59] not simply unreasonable; it is to make "reprehensibility" a concept without constraining force, *i. e.*, to deprive the concept of its constraining power to protect against serious and capricious deprivations.

517 U.S. 559, *590; 116 S. Ct. 1589, **1606; 134 L. Ed. 2d 809, ***836; 1996 U.S. LEXIS 3390, ****59

[*591] (c) *Green Oil's* third factor requires "punitive damages" to "remove the profit" of the illegal activity and "be in excess of the profit, so that the defendant recognizes a loss." *Green Oil, 539 So. 2d at 223*. This factor has the ability to limit awards to a fixed, rational amount. But as applied, that concept's potential was not realized, for the court did not limit the award to anywhere near the $ 56,000 in profits evidenced in the record. Given the record's description of the conduct and its prevalence, this factor could not justify much of the $ 2 million award.

(d) *Green Oil's* fourth factor is the "financial position" of the defendant. *Ibid.* Since a fixed dollar award will punish a poor person more than a wealthy one, one can understand the relevance of this factor to the State's [**1607] interest in retribution (though not necessarily to its interest in deterrence, given the more distant relation between a defendant's wealth and its responses to economic [****60] incentives). See *TXO, 509 U.S. at 462*, and n. 28 (plurality opinion); *id., at 469* (KENNEDY, J., concurring in part and concurring in judgment); *Haslip, 499 U.S. at 21-22*; *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 300, 106 L. Ed. 2d 219, 109 S. Ct. 2909 (1989)* (O'CONNOR, J., concurring in part and dissenting in part). This factor, however, is not necessarily intended to act as a significant *constraint* on punitive awards. Rather, it provides an open-ended basis for inflating awards when the defendant is wealthy, as this case may illustrate. That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as "reprehensibility," to constrain significantly an award that purports to punish a defendant's conduct.

(e) *Green Oil's* fifth factor is the "costs of litigation" and the State's desire "to encourage plaintiffs to bring wrongdoers to trial." *539 So. 2d at 223*. This standard provides meaningful constraint to the extent that the enhancement it authorized is linked to a fixed, ascertainable amount approximating actual costs, even when defined generously [****61] to reflect [*592] the contingent nature of plaintiffs' victories. But as this case shows, the factor cannot operate as a constraint when an award much in excess of costs is approved for other reasons. An additional aspect of the standard -- the need to "encourage plaintiffs to bring wrongdoers to trial" -- is a factor that does not constrain, [***837] but enhances, discretionary power -- especially when unsupported by evidence of a *special* need to encourage litigation (which the Alabama courts here did not mention).

(f) *Green Oil's* sixth factor is whether or not "criminal sanctions have been imposed on the defendant for his conduct." *Ibid.* This factor did not apply here.

(g) *Green Oil's* seventh factor requires that "other civil actions" filed "against the same defendant, based on the same conduct," be considered in mitigation. *Id., at 224*. That factor did not apply here.

Thus, the first, second, and third *Green Oil* factors, in principle, might sometimes act as constraints on arbitrary behavior. But *as the Alabama courts interpreted those standards in this case*, even taking those three factors together, they could not have significantly constrained the court [****62] system's ability to impose "grossly excessive" awards.

Third, the state courts neither referred to, nor made any effort to find, nor enunciated any other standard that either directly, or indirectly as background, might have supplied the constraining legal force that the statute and *Green Oil* standards (as interpreted here) lack. Dr. Gore did argue to the jury an economic theory based on the need to offset the totality of the harm that the defendant's conduct caused. Some theory of that general kind might have provided a significant constraint on arbitrary awards (at least where confined to the relevant harm-causing conduct, see *ante*, at 570-574). Some economists, for example, have argued for a standard that would deter illegal activity causing solely economic harm through the use of punitive damages awards that, as a whole, would take from a wrongdoer the total cost of the [*593] harm caused. See, e. g., S. Shavell, Economic Analysis of Accident Law 162 (1987) ("If liability equals losses caused multiplied by . . . the inverse of the probability of suit, injurers will act optimally under liability rules despite the chance that they will escape suit"); Cooter, Punitive [****63] Damages for Deterrence: When and How Much, 40 Ala. L. Rev. 1143, 1146-1148 (1989). My understanding of the intuitive essence of some of those theories, which I put in crude form (leaving out various qualifications), is that they could permit juries to calculate punitive damages by making a rough estimate of global harm, dividing that estimate by a similarly rough estimate of the number of successful lawsuits that would likely be brought, and adding generous attorney's fees and other costs. Smaller damages would not sufficiently discourage firms from engaging in the harmful conduct, while larger damages would "over-deter" by leading potential defendants [**1608] to spend more to prevent the activity

that causes the economic harm, say, through employee training, than the cost of the harm itself. See Galligan, Augmented Awards: The Efficient Evolution of Punitive Damages, _51 La. L. Rev. 3, 17-20, 28-30 (1990)_. Larger damages might also "double count" by including in the punitive damages award some of the compensatory, or punitive, damages that subsequent plaintiffs would also recover.

The record before us, however, contains nothing suggesting that the Alabama Supreme Court, when determining **[****64]** the allowable award, applied _any_ "economic" theory that might explain the $ 2 million recovery. **[***838]** Cf. _Browning-Ferris, supra, at 300_ (noting that the Constitution "does not incorporate the views of the Law and Economics School," nor does it "'require the States to subscribe to any particular economic theory'") (O'CONNOR, J., concurring in part and dissenting in part) (quoting _CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 92, 95 L. Ed. 2d 67, 107 S. Ct. 1637 (1987))_. And courts properly tend to judge the rationality of judicial actions in terms of the reasons that were given, and the facts that were before the court, cf. _TXO, [*594] supra, at 468_ (KENNEDY, J., concurring in part and concurring in judgment), not those that might have been given on the basis of some conceivable set of facts (unlike the rationality of economic statutes enacted by legislatures subject to the public's control through the ballot box, see, _e. g._, _FCC v. Beach Communications, Inc., 508 U.S. 307, 315, 124 L. Ed. 2d 211, 113 S. Ct. 2096 (1993))_. Therefore, reference to a constraining "economic" theory, which might have counseled more deferential review by this Court, **[****65]** is lacking in this case.

Fourth, I cannot find any community understanding or historic practice that this award might exemplify and which, therefore, would provide background standards constraining arbitrary behavior and excessive awards. A punitive damages award of $ 2 million for intentional misrepresentation causing $ 56,000 of harm is extraordinary by historical standards, and, as far as I am aware, finds no analogue until relatively recent times. Amici for Dr. Gore attempt to show that this is not true, pointing to various historical cases which, according to their calculations, represented roughly equivalent punitive awards for similarly culpable conduct. See Brief for James D. A. Boyle et al. as Amici Curiae 4-5 (hereinafter Legal Historians' Brief). Among others, they cite _Wilkes_ v. _Wood_, Lofft 1, 98 Eng. Rep. 489 (C. P. 1763) (# 1,000 said to be equivalent of $ 1.5 million, for warrantless search of papers); _Huckle_ v. _Money_, 2 Wills. 205, 95 Eng. Rep. 768 (K. B. 1763) (# 300, said to be $ 450,000, for 6-hour false imprisonment); _Hewlett_ v. _Cruchley_, 5 Taunt. 277, 128 Eng. Rep. 696 (C. P. 1813) (# 2,000, said to be $ 680,000, for malicious **[****66]** prosecution); _Merest_ v. _Harvey_, 5 Taunt. 442, 128 Eng. Rep. 761 (C. P. 1814) (# 500, said to be $ 165,000, for poaching). But _amici_ apparently base their conversions on a mathematical assumption, namely, that inflation has progressed at a constant 3% rate of inflation. See Legal Historians' Brief 4. In fact, consistent, cumulative inflation is a modern phenomenon. See McCusker, How Much Is That in Real Money? A Historical Price Index for Use as a Deflator **[*595]** of Money Values in the Economy of the United States, 101 Proceedings of American Antiquarian Society 297, 310, 323-332 (1992). Estimates based on historical rates of valuation, while highly approximate, suggest that the ancient extraordinary awards are small compared to the $ 2 million here at issue, or other modern punitive damages figures. See Appendix to this opinion, _infra_, at 597-598 (suggesting that the modern equivalent of the awards in the above cases is something like $ 150,000, $ 45,000, $ 100,000, and $ 25,000, respectively). And, as the majority opinion makes clear, the record contains nothing to suggest that the extraordinary size of the award in this case is explained by the extraordinary **[****67]** wrongfulness of the defendant's behavior, measured **[***839]** by historical or community standards, rather than arbitrariness or caprice.

Fifth, there are no other legislative enactments here that classify awards and impose quantitative limits that would significantly cabin the fairly unbounded discretion created by the absence of constraining legal standards. Cf., _e. g._, _Tex. Civ. Prac. & Rem. Code [**1609] Ann. § 41.008_ (Supp. 1996) (punitive damages generally limited to greater of double damages, or $ 200,000, except cap does not apply to suits arising from certain serious criminal acts enumerated in the statute); _Conn. Gen. Stat. § 52-240b_ (1995) (punitive damages may not exceed double compensatory damages in product liability cases); _Fla. Stat. § 768.73(1)_ (Supp. 1993) (punitive damages in certain actions limited to treble compensatory damages); _Ga. Code Ann. § 51-12-5.1(g)_ (Supp. 1995) ($ 250,000 cap in certain actions).

The upshot is that the rules that purport to channel discretion in this kind of case, here did not do so in fact. That means that the award in this case was both (a) the product of a system of standards that did not significantly

constrain a court's, and hence a jury's, **[****68]** discretion in making that award; and (b) grossly excessive in light of the State's legitimate punitive damages objectives.

**[*596]** The first of these reasons has special importance where courts review a jury-determined punitive damages award. That is because one cannot expect to direct jurors like legislators through the ballot box; nor can one expect those jurors to interpret law like judges, who work within a discipline and hierarchical organization that normally promotes roughly uniform interpretation and application of the law. Yet here Alabama expects jurors to act, at least a little, like legislators or judges, for it permits them, to a certain extent, to create public policy and to apply that policy, not to compensate a victim, but to achieve a policy-related objective outside the confines of the particular case.

To the extent that neither clear legal principles nor fairly obvious historical or community-based standards (defining, say, especially egregious behavior) significantly constrain punitive damages awards, is there not a substantial risk of outcomes so arbitrary that they become difficult to square with the Constitution's assurance, to every citizen, of the law's **[****69]** protection? The standards here, as authoritatively interpreted, in my view, make this threat real and not theoretical. And, in these unusual circumstances, where legal standards offer virtually no constraint, I believe that this lack of constraining standards warrants this Court's detailed examination of the award.

The second reason -- the severe disproportionality between the award and the legitimate punitive damages objectives -- reflects a judgment about a matter of degree. I recognize that it is often difficult to determine just when a punitive award exceeds an amount reasonably related to a State's legitimate interests, or when that excess is so great as to amount to a matter of constitutional concern. Yet whatever the difficulties of drawing a precise line, once we examine the award in this case, it is not difficult to say that this award lies on the line's far side. The severe lack of proportionality between the size of the award and the underlying punitive damages objectives shows that the award falls into the category **[*597]** of "gross excessiveness" set forth in this Court's prior cases.

**[***840]** These two reasons *taken together* overcome what would otherwise amount to a **[****70]** "strong presumption of validity." *TXO, 509 U.S. at 457*. And, for those two reasons, I conclude that the award in this unusual case violates the basic guarantee of nonarbitrary governmental behavior that the Due Process Clause provides.

APPENDIX TO OPINION OF BREYER, J.

Although I recognize that all estimates of historic rates of inflation are subject to dispute, including, I assume, the sources below, those sources suggest that the value of the 18th and 19th century judgments cited by *amici* is much less than the figures *amici* arrived at under their presumption of a constant 3% rate of inflation.

In 1763, # 1 (Eng.) was worth # 1.73 Pennsylvania currency. See U.S. Bureau of the Census, Historical Statistics of the United States: Colonial Times to 1970, Series Z -- 585, p. 1198 (Bicentennial ed. 1975). For the period 1766-1772, # 1 (Penn.) was worth $ 45.99 (U.S. 1991). See McCusker, How Much Is That in Real Money? A Historical Price Index for Use as a Deflator of Money Values in the Economy of the United States, 101 American Antiquarian Society 297, 333 **[**1610]** (1992). Thus, # 1 (Eng. 1763) is worth about $ 79.56 (U.S. 1991). Accounting for the 12% inflation of the U.S. **[****71]** dollar between 1991 and 1995 (when *amici* filed their brief), see Economic Indicators, 104th Cong., 2d Sess., p. 23 (Feb. 1996), # 1 (Eng. 1763) is worth about $ 89.11 (U.S. 1995).

Calculated another way, # 1 (Eng. 1763) is worth about # 72.84 (Eng. 1991). See McCusker, *supra*, at 312, 342, 350. And # 1 (Eng. 1991) is worth $ 1.77 (U.S. 1991). See 78 Fed. Reserve Bulletin A68 (Feb. 1992). Thus, # 1 (Eng. 1763) amounts to about $ 128.93 (U.S. 1991). Again, accounting for inflation between 1991 and 1995, this amounts to about $ 144.40 (U.S. 1995).

**[*598]** Thus, the above sources suggest that the # 1,000 award in *Wilkes* in 1763 roughly amounts to between $ 89,110 and $ 144,440 today, not $ 1.5 million. And the # 300 award in *Huckle* that same year would seem to be worth between $ 26,733 and $ 43,320 today, not $ 450,000.

517 U.S. 559, *598; 116 S. Ct. 1589, **1610; 134 L. Ed. 2d 809, ***840; 1996 U.S. LEXIS 3390, ****71

For the period of the *Hewlett* and *Merest* decisions, # 1 (Eng. 1813) is worth about # 25.3 (Eng. 1991). See McCusker, *supra*, at 344, 350. Using the 1991 exchange rate, # 1 (Eng. 1813) is worth about $ 44.78 (U.S. 1991). Accounting for inflation between 1991 and 1995, this amounts to about $ 50.16 (U.S. 1995).

Thus, the # 2,000 [****72] and # 500 awards in *Hewlett* and *Merest* would seem to be closer to $ 100,320 and $ 25,080, respectively, than to *amici's* estimates of $ 680,000 and $ 165,000.

**Dissent by: SCALIA; GINSBURG**

# Dissent

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

Today we see the latest manifestation of this Court's recent and increasingly insistent "concern about punitive damages that 'run wild.'" *Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 18, 113 L. Ed. 2d 1, 111 S. Ct. 1032 (1991)*. Since the Constitution does not make that concern any of our business, the Court's activities in this area are an unjustified incursion into the province of state governments.

In earlier cases that were the prelude [***841] to this decision, I set forth my view that a state trial procedure that commits the decision whether to impose punitive damages, and the amount, to the discretion of the jury, subject to some judicial review for "reasonableness," furnishes a defendant with all the process that is "due." See *TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 470, 125 L. Ed. 2d 366, 113 S. Ct. 2711 (1993)* (SCALIA, J., concurring in judgment); [****73] *Haslip, supra, at 25-28* (SCALIA, J., concurring in judgment); cf. *Honda Motor Co. v. Oberg, 512 U.S. 415, 435-436, 129 L. Ed. 2d 336, 114 S. Ct. 2331 (1994)* (SCALIA, J., concurring). I do not regard the *Fourteenth Amendment's Due Process Clause* as a secret repository of substantive guarantees against [*599] "unfairness" -- neither the unfairness of an excessive civil compensatory award, nor the unfairness of an "unreasonable" punitive award. What the *Fourteenth Amendment's* procedural guarantee assures is an opportunity to contest the reasonableness of a damages judgment in state court; but there is no federal guarantee a damages award actually *be* reasonable. See *TXO, supra, at 471* (SCALIA, J., concurring in judgment).

This view, which adheres to the text of the Due *Process* Clause, has not prevailed in our punitive damages cases. See *TXO, 509 U.S. at 453-462* (plurality opinion); *id., at 478-481* (O'CONNOR, J., dissenting); *Haslip, supra, at 18*. When, however, a constitutional doctrine adopted by the Court is not only mistaken but also insusceptible of principled application, I do not feel bound to give it *stare decisis* effect -- indeed, I [****74] do not feel justified in doing so. See, e. g., *Witte v. United States, 515 U.S. 389, 406, 132 L. Ed. 2d 351, 115 S. Ct. 2199 (1995)* (SCALIA, J., concurring in judgment); *Walton v. Arizona, 497 U.S. 639, 673, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990)* (SCALIA, J., concurring in judgment in part and dissenting in part). Our punitive damages jurisprudence compels such a response. The Constitution provides no warrant for federalizing yet another aspect of our Nation's legal culture (no matter [**1611] how much in need of correction it may be), and the application of the Court's new rule of constitutional law is constrained by no principle other than the Justices' subjective assessment of the "reasonableness" of the award in relation to the conduct for which it was assessed.

Because today's judgment represents the first instance of this Court's invalidation of a state-court punitive assessment as simply unreasonably large, I think it a proper occasion to discuss these points at some length.

I

The most significant aspects of today's decision -- the identification of a "substantive due process" right against a "grossly excessive" award, and the concomitant assumption [*600] [****75] of ultimate authority to decide anew a matter of "reasonableness" resolved in lower court proceedings -- are of course not new. *Haslip* and *TXO* revived the notion, moribund since its appearance in the first years of this century, that the measure of civil punishment poses a question of constitutional dimension to be answered by this Court. Neither of those cases, however, nor

any of the precedents upon which they relied, actually took the step of declaring a **[***842]** punitive award unconstitutional simply because it was "too big."

At the time of adoption of the *Fourteenth Amendment*, it was well understood that punitive damages represent the assessment by the jury, as the voice of the community, of the measure of punishment the defendant deserved. See, *e. g.*, *Barry v. Edmunds, 116 U.S. 550, 565, 29 L. Ed. 729, 6 S. Ct. 501 (1886)*; *Missouri Pacific R. Co. v. Humes, 115 U.S. 512, 521, 29 L. Ed. 463, 6 S. Ct. 110 (1885)*; *Day v. Woodworth, 54 U.S. 363, 13 HOW 363, 371, 14 L. Ed. 181 (1852)*. See generally *Haslip, supra, at 25-27* (SCALIA, J., concurring in judgment). Today's decision, though dressed up as a legal opinion, is really no more than a disagreement **[****76]** with the community's sense of indignation or outrage expressed in the punitive award of the Alabama jury, as reduced by the State Supreme Court. It reflects not merely, as the concurrence candidly acknowledges, "a judgment about a matter of degree," *ante*, at 596; but a judgment about the appropriate degree of indignation or outrage, which is hardly an analytical determination.

There is no precedential warrant for giving our judgment priority over the judgment of state courts and juries on this matter. The only support for the Court's position is to be found in a handful of errant federal cases, bunched within a few years of one other, which invented the notion that an unfairly severe civil sanction amounts to a violation of constitutional liberties. These were the decisions upon which the *TXO* plurality relied in pronouncing that the Due Process Clause "imposes substantive limits 'beyond which penalties may not go,'" *509 U.S. at 454* (quoting *Seaboard Air Line R. Co. v. Seegers, 207 U.S. 73, 78, 52 L. Ed. 108, 28 S. Ct. 28 (1907)*); see also *509 U.S., [*601] at 478-481* (O'CONNOR, J., dissenting); *Haslip, supra, at 18*. Although they are our precedents, they are **[****77]** themselves too shallowly rooted to justify the Court's recent undertaking. The only case relied upon in which the Court actually invalidated a civil sanction does not even support constitutional review for excessiveness, since it really concerned the validity, as a matter of *procedural* due process, of state legislation that imposed a significant penalty on a common carrier which lacked the means of determining the legality of its actions before the penalty was imposed. See *Southwestern Telegraph & Telephone Co. v. Danaher, 238 U.S. 482, 489-491, 59 L. Ed. 1419, 35 S. Ct. 886 (1915)*. The *amount* of the penalty was not a subject of independent scrutiny. As for the remaining cases, while the opinions do consider arguments that statutory penalties can, by reason of their excessiveness, violate due process, not a single one of these judgments invalidates a damages award. See *Seaboard, supra, at 78-79*; *Waters-Pierce Oil Co. v. Texas (No. 1), 212 U.S. 86, 111-112, 53 L. Ed. 417, 29 S. Ct. 220 (1909)*; *Standard Oil Co. of Ind. v. Missouri, 224 U.S. 270, 286, 290, 56 L. Ed. 760, 32 S. Ct. 406 (1912)*; *St. Louis, I. M. & S. R. Co. v. Williams, 251 U.S. [****78] 63, 66-67, [**1612] 64 L. Ed. 139, 40 S. Ct. 71 (1919)*.

More importantly, this latter group of cases -- which again are the *sole* precedential foundation put forward for the rule of constitutional law espoused by today's Court -- simply fabricated the "substantive due process" right at issue. *Seaboard* assigned no precedent to its bald assertion **[***843]** that the Constitution imposes "limits beyond which penalties may not go," *207 U.S. at 78*. *Waters-Pierce* cited only *Coffey v. County of Harlan, 204 U.S. 659, 51 L. Ed. 666, 27 S. Ct. 305 (1907)*, a case which inquired into the constitutionality of state *procedure*, *id., at 662-663*. *Standard Oil* simply cited *Waters-Pierce*, and *St. Louis, I. M. & S. R. Co.* offered in addition to these cases only *Collins v. Johnston, 237 U.S. 502, 59 L. Ed. 1071, 35 S. Ct. 649 (1915)*, which said nothing to support the notion of a "substantive due process" right against excessive civil penalties, but to the contrary asserted that the prescribing and imposing of criminal punishment were "functions peculiarly belonging to the several States," **[*602]** *id., at 509-510*. Thus, the only authority for the Court's position is simply **[****79]** not authoritative. These cases fall far short of what is needed to supplant this country's longstanding practice regarding exemplary awards, see, *e. g.*, *Haslip, 499 U.S. at 15-18*; *id., at 25-28* (SCALIA, J., concurring in judgment).

II

One might understand the Court's eagerness to enter this field, rather than leave it with the state legislatures, if it had something useful to say. In fact, however, its opinion provides virtually no guidance to legislatures, and to state and federal courts, as to what a "constitutionally proper" level of punitive damages might be.

We are instructed at the outset of Part II of the Court's opinion -- the beginning of its substantive analysis -- that "the federal excessiveness inquiry . . . begins with an identification of the state interests that a punitive award is

designed to serve." *Ante*, at 568. On first reading this, one is faced with the prospect that federal punitive damages law (the new field created by today's decision) will be beset by the sort of "interest analysis" that has laid waste the formerly comprehensible field of conflict of laws. The thought that each assessment of punitive damages, as to each offense, must be examined **[****80]** to determine the precise "state interests" pursued, is most unsettling. Moreover, if those "interests" are the most fundamental determinant of an award, one would think that due process would require the assessing jury to be *instructed* about them.

It appears, however (and I certainly hope), that all this is a false alarm. As Part II of the Court's opinion unfolds, it turns out to be directed, not to the question "How much punishment is too much?" but rather to the question "Which acts can be punished?" "Alabama does not have the power," the Court says, "to punish BMW for conduct that was lawful where it occurred and that had no impact on Alabama or its residents." *Ante*, at 572-573. That may be true, though **[*603]** only in the narrow sense that a person cannot be *held liable to be punished* on the basis of a lawful act. But if a person has been held subject to punishment because he committed an *unlawful* act, the *degree* of his punishment assuredly *can* be increased on the basis of any other conduct of his that displays his wickedness, unlawful or not. Criminal sentences can be computed, we have said, on the basis of "information concerning every aspect of **[****81]** a defendant's life," *Williams v. New York, **[***844]** 337 U.S. 241, 250-252, 93 L. Ed. 1337, 69 S. Ct. 1079 (1949)*. The Court at one point seems to acknowledge this, observing that, although a sentencing court "[cannot] properly *punish* lawful conduct," it may in assessing the penalty "consider . . . lawful conduct that bears on the defendant's character." *Ante*, at 573, n. 19. That concession is quite incompatible, however, with the later assertion that, since "neither the jury nor the trial court was presented with evidence that any of BMW's out-of-state conduct was unlawful," the Alabama Supreme Court "therefore properly eschewed reliance on BMW's out-of-state conduct, . . . and based its remitted award solely on conduct that occurred within Alabama." *Ante*, at 573-574. Why could the Supreme Court of Alabama not consider lawful (but disreputable) conduct, both inside **[**1613]** and outside Alabama, for the purpose of assessing just how bad an actor BMW was?

The Court follows up its statement that "Alabama does not have the power . . . to punish BMW for conduct that was lawful where it occurred" with the statement: "Nor may Alabama impose sanctions on BMW in order to deter conduct **[****82]** that is lawful in other jurisdictions." *Ante*, at 572-573. The Court provides us no citation of authority to support this proposition -- other than the barely analogous cases cited earlier in the opinion, see *ante*, at 571-572 -- and I know of none.

These significant issues pronounced upon by the Court are not remotely presented for resolution in the present case. There is no basis for believing that Alabama has sought to control conduct elsewhere. The statutes at issue merely **[*604]** permit civil juries to treat conduct such as petitioner's as fraud, and authorize an award of appropriate punitive damages in the event the fraud is found to be "gross, oppressive, or malicious," *Ala. Code § 6-11-20(b)(1)* (1993). To be sure, respondent did invite the jury to consider out-of-state conduct in its calculation of damages, but any increase in the jury's initial award based on that consideration is not a component of the remitted judgment before us. As the Court several times recognizes, in computing the amount of the remitted award the Alabama Supreme Court -- whether it was constitutionally required to or not -- "expressly disclaimed any reliance on acts that occurred in other **[****83]** jurisdictions." *Ante*, at 567 (internal quotation marks omitted); see also *ante*, at 573-574. * Thus, the only question presented by this case is whether that award, limited to petitioner's Alabama conduct and viewed in light of the factors identified as properly informing the inquiry, is excessive. The Court's sweeping (and largely unsupported) statements regarding the relationship of punitive awards **[***845]** to lawful or unlawful out-of-state conduct are the purest dicta.

---

* The Alabama Supreme Court said:

"We must conclude that the award of punitive damages was based in large part on conduct that happened in other jurisdictions . . . . Although evidence of similar acts in other jurisdictions is admissible as to the issue of 'pattern and practice' of such acts, . . . this jury could not use the number of similar acts that a defendant has committed in other jurisdictions as a multiplier when determining the *dollar amount* of a punitive damages award. Such evidence may not be considered in setting the size of the civil penalty, because neither the jury nor the trial court had evidence before it showing in which states the conduct was wrongful." *646 So. 2d 619, 627 (1994)*.

**[****84]   III**

In Part III of its opinion, the Court identifies "three guideposts" that lead it to the conclusion that the award in this case is excessive: degree of reprehensibility, ratio between punitive award and plaintiff's actual harm, and legislative **[*605]** sanctions provided for comparable misconduct. *Ante*, at 574-585. The legal significance of these "guideposts" is nowhere explored, but their necessary effect is to establish federal standards governing the hitherto exclusively state law of damages. Apparently (though it is by no means clear) all three federal "guideposts" can be overridden if "necessary to deter future misconduct," *ante*, at 584 -- a loophole that will encourage state reviewing courts to uphold awards as necessary for the "adequat[e] protect[ion]" of state consumers, *ibid*. By effectively requiring state reviewing courts to concoct rationalizations -- whether within the "guideposts" or through the loophole -- to justify the intuitive punitive reactions of state juries, the Court accords neither category of institution the respect it deserves.

Of course it will not be easy for the States to comply with this new federal law of damages, no matter **[****85]** how willing they are to do so.  In truth, the "guideposts" mark a road to nowhere; they provide no real guidance at all. As to "degree of reprehensibility" of the defendant's conduct, we learn that "'nonviolent crimes are less serious than crimes marked by violence or the threat of violence,'" *ante*, at 576 (quoting *Solem v. Helm, 463 U.S. 277, 292-293, 77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983))*, and that "'trickery and deceit'" are "more reprehensible than negligence," *ante*, at 576. As to the ratio of punitive to compensatory damages, we are told that a "'general concer[n] of reasonableness . . . enter[s] into the constitutional **[**1614]** calculus,'" *ante*, at 583 (quoting *TXO, 509 U.S. at 458*) -- though even "a breathtaking 500 to 1" will not necessarily do anything more than "'raise a suspicious judicial eyebrow,'" *ante*, at 583 (quoting *TXO, supra, at 481* (O'CONNOR, J., dissenting), an opinion which, when confronted with that "breathtaking" ratio, approved it). And as to legislative sanctions provided for comparable misconduct, they should be accorded "'substantial deference,'" *ante*, at 583 (quoting *Browning-Ferris Industries of Vt., Inc. v. Kelco* **[****86]** *Disposal, Inc., 492 U.S. 257, 301, 106 L. Ed. 2d 219, 109 S. Ct. 2909 (1989)* (O'CONNOR, J., concurring in part and dissenting **[*606]** in part)). One expects the Court to conclude: "To thine own self be true."

These criss-crossing platitudes yield no real answers in no real cases. And it must be noted that the Court nowhere says that these three "guideposts" are the *only* guideposts; indeed, it makes very clear that they are not -- explaining away the earlier opinions that do not really follow these "guideposts" on the basis of *additional* factors, thereby "reiterating our rejection of a categorical approach." *Ante*, at 582. In other words, even these utter platitudes, if they should ever happen to produce an answer, may be overridden by other unnamed considerations. The Court has constructed a framework that does not **[***846]** genuinely constrain, that does not inform state legislatures and lower courts -- that does nothing at all except confer an artificial air of doctrinal analysis upon its essentially ad hoc determination that this particular award of punitive damages was not "fair."

The Court distinguishes today's result from *Haslip* and *TXO* partly on the ground **[****87]** that "the record in this case discloses no deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive, such as were present in *Haslip* and *TXO*." *Ante*, at 579. This seemingly rejects the findings necessarily made by the jury -- that petitioner had committed a fraud that was "gross, oppressive, or malicious," *Ala. Code § 6-11-20(b)(1)* (1993). Perhaps that rejection is intentional; the Court does not say.

The relationship between judicial application of the new "guideposts" and jury findings poses a real problem for the Court, since as a matter of logic there is no more justification for ignoring the jury's determination as to *how* reprehensible petitioner's conduct was (*i. e.*, how much it deserves to be punished), than there is for ignoring its determination that it was reprehensible *at all* (*i. e.*, that the wrong was willful and punitive damages are therefore recoverable). That the issue has been framed in terms of a constitutional right against unreasonably *excessive* awards should not obscure **[*607]** the fact that the logical and necessary consequence of the Court's approach is the recognition of a **[****88]** constitutional right against unreasonably *imposed* awards as well. The elevation of "fairness" in punishment to a principle of "substantive due process" means that every punitive award unreasonably imposed is unconstitutional; such an award is by definition excessive, since it attaches a penalty to conduct undeserving of punishment. Indeed, if the Court is correct, it must be that every claim that a state jury's award of *compensatory* damages is "unreasonable" (because not supported by the evidence) amounts to an assertion of

constitutional injury. See *TXO, supra, at 471* (SCALIA, J. concurring in judgment). And the same would be true for determinations of liability. By today's logic, *every* dispute as to evidentiary sufficiency in a state civil suit poses a question of constitutional moment, subject to review in this Court. That is a stupefying proposition.

For the foregoing reasons, I respectfully dissent.

JUSTICE GINSBURG, with whom THE CHIEF JUSTICE joins, dissenting.

The Court, I am convinced, unnecessarily and unwisely ventures into territory traditionally within the States' domain, and does so in the face of reform measures recently adopted or currently under **[****89]** consideration in legislative arenas. The Alabama Supreme Court, in this case, endeavored to follow this Court's prior instructions; and, more recently, Alabama's highest court has installed further **[**1615]** controls on awards of punitive damages (see *infra*, at 613-614, n. 6). I would therefore leave the state court's judgment undisturbed, and resist unnecessary intrusion into an area dominantly of state concern.

I

The respect due the Alabama Supreme Court requires that we strip **[***847]** from this case a false issue: No impermissible "extraterritoriality" infects the judgment before us; the excessiveness **[*608]** of the award is the sole issue genuinely presented. The Court ultimately so recognizes, see *ante*, at 573-574, but further clarification is in order.

Dr. Gore's experience was not unprecedented among customers who bought BMW vehicles sold as flawless and brand-new. In addition to his own encounter, Gore showed, through paint repair orders introduced at trial, that on 983 other occasions since 1983, BMW had shipped new vehicles to dealers without disclosing paint repairs costing at least $ 300, Tr. 585-586; at least 14 of the repainted vehicles, the evidence also showed, were sold **[****90]** as new and undamaged to consumers in *Alabama. 646 So. 2d 619, 623 (Ala. 1994)*. Sales nationwide, Alabama's Supreme Court said, were admissible "as to the issue of a 'pattern and practice' of such acts." *Id., at 627*. There was "no error," the court reiterated, "in the admission of the evidence that showed how pervasive the nondisclosure policy was and the intent behind BMW NA's adoption of it." *Id., at 628*. That determination comports with this Court's expositions. See *TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 462, 125 L. Ed. 2d 366, 113 S. Ct. 2711, and n. 28 (1993)* (characterizing as "well-settled" the admissibility of "evidence of [defendant's] alleged wrongdoing in other parts of the country" and of defendant's "wealth"); see also Brief for Petitioner 22 (recognizing that similar acts, out-of-state, traditionally have been considered relevant "for the limited purpose of determining that the conduct before the court was reprehensible because it was part of a pattern rather than an isolated incident").

Alabama's highest court next declared that the

> "jury could not use the number of similar acts that a defendant has committed in other **[****91]** jurisdictions as a multiplier when determining the *dollar amount* of a punitive damages award. Such evidence may not be considered in setting the size of the civil penalty, because neither the jury nor the trial court had evidence before it showing in which states the conduct was wrongful." **[*609]** *646 So. 2d at 627* (emphasis in original) (footnote omitted).

Because the Alabama Supreme Court provided this clear statement of the State's law, the multiplier problem encountered in Gore's case is not likely to occur again. Now, as a matter of Alabama law, it is plainly impermissible to assess punitive damages by multiplication based on out-of-state events not shown to be unlawful. See, *e. g.,  Independent Life and Accident Ins. Co. v. Harrington. 658 So. 2d 892. 902-903 (Ala. 1994)* (under *BMW* v. *Gore*, trial court erred in relying on defendant insurance company's out-of-state insurance policies in determining harm caused by defendant's unlawful actions).

No Alabama authority, it bears emphasis -- no statute, judicial decision, or trial judge instruction -- ever countenanced the jury's multiplication of the $ 4,000 diminution in value estimated for each refinished **[****92]** car by the number of such cars (approximately 1,000) shown to have been sold nationwide. The sole prompt to the jury

to use nationwide sales as a multiplier came from Gore's lawyer during summation. App. 31, Tr. 812-813. Notably, counsel **[\*\*\*848]** for BMW failed to object to Gore's multiplication suggestion, even though BMW's counsel interrupted to make unrelated objections four other times during Gore's closing statement. Tr. 810-811, 854-855, 858, 870-871. Nor did BMW's counsel request a charge instructing the jury not to consider out-of-state sales in calculating the punitive damages award. See Record 513-529 (listing all charges requested by counsel).

Following the verdict, BMW's counsel challenged the *admission* of the paint repair orders, but not, alternately, the jury's apparent use of the orders in a multiplication exercise. Curiously, during postverdict argument, BMW's counsel urged that if the **[\*\*1616]** repair orders were indeed admissible, then Gore would have a "full right" to suggest a multiplier-based disgorgement. Tr. 932.

**[\*610]** In brief, Gore's case is idiosyncratic. The jury's improper multiplication, tardily featured by petitioner, is unlikely to recur in Alabama and does **[\*\*\*\*93]** not call for error correction by this Court.

Because the jury apparently (and erroneously) had used acts in other States as a multiplier to arrive at a $ 4 million sum for punitive damages, the Alabama Supreme Court itself determined "'the maximum amount that a properly functioning jury could have awarded.'" *646 So. 2d at 630* (Houston, J., concurring specially) (quoting *Big B, Inc. v. Cottingham, 634 So. 2d 999, 1006 (Ala. 1993)).* The *per curiam* opinion emphasized that in arriving at $ 2 million as "the *amount of punitive damages* to be awarded in this case, [the court did] not consider those acts that occurred in other jurisdictions." *646 So. 2d at 628* (emphasis in original). As this Court recognizes, the Alabama high court "properly eschewed reliance on BMW's out-of-state conduct and based its remitted award solely on conduct that occurred within Alabama." *Ante*, at 573-574 (citation omitted). In sum, the Alabama Supreme Court left standing the jury's decision that the facts warranted *an award* of punitive damages -- a determination not contested in this Court -- and the state court concluded that, considering only acts in Alabama, $ 2 million was "a constitutionally **[\*\*\*\*94]** reasonable punitive damages award." *646 So. 2d at 629.*

II

A

Alabama's Supreme Court reports that it "thoroughly and painstakingly" reviewed the jury's award, *ibid.*, according to principles set out in its own pathmarking decisions and in this Court's opinions in *TXO and Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21, 113 L. Ed. 2d 1, 111 S. Ct. 1032 (1991). 646 So. 2d at 621.* The Alabama court said it gave weight to several factors, including BMW's deliberate ("reprehensible") presentation of refinished cars as new and undamaged, without disclosing that the value of those cars had been reduced by an estimated **[\*611]** 10%, [1] the financial position of the defendant, and the costs of litigation. *Id., at 625-626.* These standards, we previously held, "impos[e] a sufficiently definite and meaningful constraint on the discretion of Alabama factfinders in awarding punitive damages." *Haslip, [\*\*\*849] 499 U.S. at 22*; see also *TXO, 509 U.S. at 462, n. 28.* Alabama's highest court could have displayed its labor pains more visibly, [2] but its judgment is nonetheless entitled to a presumption of legitimacy. See *Rowan v. Runnels, 46 U.S. 134, 5 HOW 134, 139, [\*\*\*\*95] 12 L. Ed. 85 (1847)* ("This court will always feel itself bound to respect the decisions of the State courts, and from the time they are made will regard them as conclusive in all cases upon the construction of their own constitution and laws.").

We accept, of course, that Alabama's Supreme Court applied the State's own law correctly. Under that law, the State's objectives -- "punishment **[\*\*\*\*96]** and deterrence" -- guide punitive damages awards. See *Birmingham v.*

---

[1] According to trial testimony, in late May 1992, BMW began redirecting refinished cars out of Alabama and two other States. Tr. 964. The jury returned its verdict in favor of Gore on June 12, 1992. Five days later, BMW changed its national policy to one of full disclosure. *Id., at 1026.*

[2] See, *e. g.*, Brief for Law and Economics Scholars et al. as *Amici Curiae* 6-28 (economic analysis demonstrates that Alabama Supreme Court's judgment was not unreasonable); W. Landes & R. Posner, Economic Structure of Tort Law 160-163 (1987) (economic model for assessing propriety of punitive damages in certain tort cases).

*Benson, 631 So. 2d 902, 904 (Ala. 1994)*. Nor should we be quick to find a constitutional infirmity when the highest state court endeavored a corrective for one counsel's slip and the other's oversight -- counsel for plaintiff's excess in summation, unobjected to by counsel for defendant, see *supra, at 609* -- and when the state court did so intending to follow the process approved in our *Haslip* and *TXO* decisions.

B

The Court finds Alabama's $ 2 million award not simply excessive, but grossly so, and therefore unconstitutional. [*612] The decision [**1617] leads us further into territory traditionally within the States' domain, [3] and commits the Court, now and again, to correct "misapplication of a properly stated rule of law." But cf. this Court's Rule 10 ("A petition for a writ of certiorari is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated rule of law."). [4] [****98] The Court is not well equipped [*613] for this mission. Tellingly, the Court repeats that it brings to the task no "mathematical [***850] formula," *ante*, at 582, no "categorical [****97] approach," *ibid.*, no "bright line," *ante*, at 585. It has only a vague concept of substantive due process, a "raised eyebrow" test, see *ante*, at 583, as its ultimate guide. [5]

In contrast to habeas corpus review under *28 U.S.C. § 2254*, the Court will work at this business alone. It will not be aided by the federal district courts [****99] and courts of appeals. It will be the *only* federal court policing the area. The Court's readiness to superintend state-court punitive damages awards is all the more puzzling in view of the Court's longstanding reluctance to countenance review, even by courts of appeals, of the size of verdicts returned by juries in federal district court proceedings. See generally 11 C. Wright, A. Miller, & M. Kane, Federal

---

[3] See *ante*, at 568 ("In our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case."); *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 278, 106 L. Ed. 2d 219, 109 S. Ct. 2909 (1989)* (In any "lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law."); *Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255, 78 L. Ed. 2d 443, 104 S. Ct. 615 (1984)* ("Punitive damages have long been a part of traditional state tort law.").

[4] Petitioner invites the Court to address the question of multiple punitive damages awards stemming from the same alleged misconduct. The Court does not take up the invitation, and rightly so, in my judgment, for this case does not present the issue. For three reasons, the question of multiple awards is hypothetical, not real, in Gore's case. First, the punitive damages award in favor of Gore is the only such award yet entered against BMW on account of its nondisclosure policy.

Second, BMW did not raise the issue of multiple punitives below. Indeed, in its reply brief before the Alabama Supreme Court, BMW stated: "Gore confuses our point about fairness among plaintiffs. He treats this point as a premature 'multiple punitive damages' argument. But, contrary to Gore's contention, we are not asking this Court to hold, as a matter of law, that a 'constitutional violation occurs when a defendant is subjected to punitive damages in two separate cases.'" Reply Brief for Appellant in Nos. 1920324, 1920325 (Ala. Sup. Ct.), p. 48 (internal citations omitted).

Third, if BMW had already suffered a punitive damages judgment in connection with its nondisclosure policy, Alabama's highest court presumably would have taken that fact into consideration. In reviewing punitive damages awards attacked as excessive, the Alabama Supreme Court considers whether "there have been other civil actions against the same defendant, based on the same conduct." *646 So. 2d 619, 624 (1994)* (quoting *Green Oil Co. v. Hornsby, 539 So. 2d 218, 224 (Ala. 1989)*). If so, "this should be taken into account in mitigation of the punitive damages award." *646 So. 2d at 624*. The Alabama court accordingly observed that Gore's counsel had filed 24 other actions against BMW in Alabama and Georgia, but that no other punitive damages award had so far resulted. *Id., at 626*.

[5] Justice Breyer's concurring opinion offers nothing more solid. Under *Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 113 L. Ed. 2d 1, 111 S. Ct. 1032 (1991)*, he acknowledges, Alabama's standards for punitive damages, standing alone, do not violate due process. *Ante*, at 588. But they "invit[e] the kind of scrutiny the Court has given the particular verdict before us." *Ibid*. Pursuing that invitation, Justice Breyer considers whether "matching the particular facts of this case to Alabama's 'legitimate punitive damages objectives,'" *ante*, at 596, the award was "'gross[ly] excessive[e],'" *ante*, at 597. The exercise is engaging, but ultimately tells us only this: too big will be judged unfair. What is the Court's measure of too big? Not a cap of the kind a legislature could order, or a mathematical test this Court can divine and impose. Too big is, in the end, the amount at which five Members of the Court bridle.

Practice and Procedure § 2820 (2d ed. 1995). And the reexamination prominent in state courts [6] and in legislative arenas, see Appendix, **[\*614]** **[\*\*1618]** *infra* this page, serves to underscore why the Court's enterprise is undue.

**[\*\*\*\*100]** For the reasons stated, I dissent from this Court's disturbance of the judgment the Alabama Supreme Court has made.

**[\*\*\*851]** APPENDIX TO OPINION OF GINSBURG, J.

STATE LEGISLATIVE ACTIVITY REGARDING PUNITIVE DAMAGES

State legislatures have in the hopper or have enacted a variety of measures to curtail awards of punitive damages. At least one state legislature has prohibited punitive damages altogether, unless explicitly provided by statute. See *N. H. Rev. Stat. Ann. § 507:16* (1994). We set out in this appendix some of the several controls enacted or under consideration in the States. The measures surveyed are: (1) caps on awards; (2) provisions for payment of sums to state agencies rather than to plaintiffs; and (3) mandatory bifurcated trials with separate proceedings for punitive damages determinations.

**[\*615]** I. CAPS ON PUNITIVE DAMAGES AWARDS

\* *Colorado* -- *Colo. Rev. Stat. §§ 13-21-102(1)(a)* and *(3)* (1987) (as a main rule, caps punitive damages at amount of actual damages).

\* *Connecticut* -- *Conn. Gen. Stat. § 52-240b* (1995) (caps punitive damages at twice compensatory damages in products liability cases).

\* *Delaware* -- H. R. 237, 138th Gen. Ass. (introduced May **[\*\*\*\*101]** 17, 1995) (would cap punitive damages at greater of three times compensatory damages, or $ 250,000).

\* *Florida* -- *Fla. Stat. §§ 768.73(1)(a)* and *(b)* (Supp. 1992) (in general, caps punitive damages at three times compensatory damages).

\* *Georgia* -- *Ga. Code Ann. § 51-12-5.1* (Supp. 1995) (caps punitive damages at $ 250,000 in some tort actions; prohibits multiple awards stemming from the same predicate conduct in products liability actions).

\* *Illinois* -- H. 20, 89th Gen. Ass. 1995-1996 Reg. Sess. (enacted Mar. 9, 1995) (caps punitive damages at three times economic damages).

\* *Indiana* -- H. 1741, 109th Reg. Sess. (enacted Apr. 26, 1995) (caps punitive damages at greater of three times compensatory damages, or $ 50,000).

---

[6] See, *e. g.*, *Distinctive Printing and Packaging Co. v. Cox, 232 Neb. 846, 857, 443 N.W.2d 566, 574 (1989)* (*per curiam*) ("Punitive, vindictive, or exemplary damages contravene *Neb. Const. art. VII, § 5*, and thus are not allowed in this jurisdiction."); *Santana v. Registrars of Voters of Worcester, 398 Mass. 862, 502 N.E.2d 132 (1986)* (punitive damages are not permitted, unless expressly authorized by statute); *Fisher Properties, Inc. v. Arden-Mayfair, Inc., 106 Wash. 2d 826, 852, 726 P.2d 8, 23 (1986)* (en banc) (same).

In *Life Ins. Co. of Georgia* v. *Johnson*, No. 1940357 (Nov. 17, 1995), the Alabama Supreme Court revised the State's regime for assessments of punitive damages. Henceforth, trials will be bifurcated. Initially, juries will be instructed to determine liability and the amount of compensatory damages, if any; also, the jury is to return a special verdict on the question whether a punitive damages award is warranted. If the jury answers yes to the punitive damages question, the trial will be resumed for the presentation of evidence and instructions relevant to the amount appropriate to award as punitive damages. After postverdict trial court review and subsequent appellate review, the amount of the final punitive damages judgment will be paid into the trial court. The trial court will then order payment of litigation expenses, including the plaintiff's attorney's fees, and instruct the clerk to divide the remainder equally between the plaintiff and the State General Fund. The provision for payment to the State General Fund is applicable to all judgments not yet satisfied, and therefore would apply to the judgment in Gore's case.

* *Kansas* -- *Kan. Stat. Ann. §§ 60-3701(e)* and *(f)* (1994) (in general, caps punitive damages at lesser of defendant's annual gross income, or $ 5 million).

* *Maryland* -- S. 187, 1995 Leg. Sess. (introduced Jan. 27, 1995) (in general, would cap punitive damages at four times compensatory damages).

* *Minnesota* -- S. 489, 79th Leg. Sess., 1995 Reg. Sess. (introduced Feb. 16, 1995) (would require reasonable relationship between compensatory [****102] and punitive damages).

* *Nevada* -- *Nev. Rev. Stat. § 42.005(1)* (1993) (caps punitive damages at three times compensatory damages if compensatory damages equal $ 100,000 or more, and at $ 300,000 if the compensatory damages are less than $ 100,000).

[*616] * *New Jersey* -- S. 1496, 206th Leg., 2d Ann. Sess. (1995) (caps punitive damages at greater of five times compensatory damages, or $ 350,000, in certain tort cases).

* *North Dakota* -- *N. D. Cent. Code § 32-03.2-11(4)* (Supp. 1995) (caps punitive damages [**1619] at greater of two times compensatory damages, or $ 250,000).

* *Oklahoma* -- *Okla Stat., Tit. 23, §§ 9.1(B)-(D)* (Supp. 1996) (caps punitive [***852] damages at greater of $ 100,000, or actual damages, if jury finds defendant guilty of reckless disregard; and at greatest of $ 500,000, twice actual damages, or the benefit accruing to defendant from the injury-causing conduct, if jury finds that defendant has acted intentionally and maliciously).

* *Texas* -- S. 25, 74th Reg. Sess. (enacted Apr. 20, 1995) (caps punitive damages at twice economic damages, plus up to $ 750,000 additional noneconomic damages).

* *Virginia* -- *Va. Code Ann. § 8.01-38.1* (1992) (caps [****103] punitive damages at $ 350,000).

II. ALLOCATION OF PUNITIVE DAMAGES TO STATE AGENCIES

* *Arizona* -- H. R. 2279, 42d Leg., 1st Reg. Sess. (introduced Jan. 12, 1995) (would allocate punitive damages to a victims' assistance fund, in specified circumstances).

* *Florida* -- *Fla. Stat. §§ 768.73(2)(a)-(b)* (Supp. 1992) (allocates 35% of punitive damages to General Revenue Fund or Public Medical Assistance Trust Fund); see *Gordon v. State, 585 So. 2d 1033, 1035-1038 (Fla. App. 1991)*, aff'd, *608 So. 2d 800 (Fla. 1992)* (upholding provision against due process challenge).

* *Georgia* -- *Ga. Code Ann. § 51-12-5.1(e)(2)* (Supp. 1995) (allocates 75% of punitive damages, less a proportionate part of litigation costs, including counsel fees, to state treasury); see *Mack Trucks, Inc. v. Conkle, 263 Ga. 539, 540-543, 436 S.E.2d 635, 637-639 (Ga. 1993)* (upholding provision against constitutional challenge).

[*617] * *Illinois* -- Ill. Comp. Stat., ch. 735, § 5/2-1207 (1994) (permits court to apportion punitive damages among plaintiff, plaintiff's attorney, and Illinois Department of Rehabilitation Services).

* *Indiana* -- H. 1741, 109th Reg. Sess. (enacted Apr. [****104] 26, 1995) (subject to statutory exceptions, allocates 75% of punitive damages to a compensation fund for violent crime victims).

* *Iowa* -- *Iowa Code § 668A.1(2)(b)* (1987) (in described circumstances, allocates 75% of punitive damages, after payment of costs and counsel fees, to a civil reparations trust fund); see *Shepherd Components, Inc. v. Brice Petrides-Donohue & Assoc., Inc., 473 N.W.2d 612, 619 (Iowa 1991)* (upholding provision against constitutional challenge).

* *Kansas* -- *Kan. Stat. Ann. § 60-3402(e)* (1994) (allocates 50% of punitive damages in medical malpractice cases to state treasury).

* *Missouri* -- *Mo. Rev. Stat. § 537.675* (1994) (allocates 50% of punitive damages, after payment of expenses and counsel fees, to Tort Victims' Compensation Fund).

* *Montana* -- H. 71, 54th Leg. Sess. (introduced Jan. 2, 1995) (would allocate 48% of punitive damages to state university system and 12% to school for the deaf and blind).

* *New Jersey* -- S. 291, 206th Leg., 1994-1995 1st Reg. Sess. (introduced Jan. 18, 1994); A. 148, 206th Leg., 1994-1995 1st Reg. Sess. (introduced Jan. 11, 1994) (would allocate 75% of punitive damages to New Jersey Health Care **[****105]** Trust Fund).

* *New Mexico* -- H. 1017, 42d Leg., 1st Sess. (introduced Feb. 16, 1995) (would allocate punitive damages to Low-Income Attorney Services Fund).

* *Oregon* -- S. 482, 68th Leg. Ass. (enacted July 19, 1995) (amending **[***853]** *Ore. Rev. Stat. §§ 18.540* and *30.925*, and repealing *Ore. Rev. Stat. § 41.315*) (allocates 60% of punitive damages to Criminal Injuries Compensation Account).

 **[*618]** * *Utah* -- Utah Code Ann. § 78-18-1(3) (1992) (allocates 50% of punitive damages in excess of $ 20,000 to state treasury).

III. MANDATORY BIFURCATION OF LIABILITY AND PUNITIVE DAMAGES DETERMINATIONS

* *California* -- *Cal. Civ. Code Ann. § 3295(d)* (West Supp. 1995) (requires bifurcation, on application of defendant, of liability and damages phases of trials in which punitive damages are requested).

* *Delaware* -- H. R. 237, 138th Gen. Ass. (introduced May 17, 1995) (would require, at **[**1620]** request of any party, a separate proceeding for determination of punitive damages).

* *Georgia* -- *Ga. Code Ann. § 51-12-5.1(d)* (Supp. 1995) (in all cases in which punitive damages are claimed, liability for punitive damages is tried first, then amount of punitive damages).

* *Illinois* **[****106]** -- H. 20, 89th Gen. Ass., 1995-1996 Reg. Sess. (enacted Mar. 9, 1995) (mandates, upon defendant's request, separate proceeding for determination of punitive damages).

* *Kansas* -- *Kan. Stat. Ann. §§ 60-3701(a)* and *(b)* (1994) (trier of fact determines defendant's liability for punitive damages, then court determines amount of such damages).

* *Missouri* -- *Mo. Rev. Stat. §§ 510.263(1)* and *(3)* (1994) (mandates bifurcated proceedings, on request of any party, for jury to determine first whether defendant is liable for punitive damages, then amount of punitive damages).

* *Montana* -- *Mont. Code Ann. § 27-1-221(7)* (1995) (upon finding defendant liable for punitive damages, jury determines the amount in separate proceeding).

* *Nevada* -- *Nev. Rev. Stat. § 42.005(3)* (1993) (if jury determines that punitive damages will be awarded, jury then determines amount in separate proceeding).

* *New Jersey* -- *N. J. Stat. Ann. §§ 2A:58C-5(b)* and *(d)* (West 1987) (mandates separate proceedings for determination of compensatory and punitive damages).

 **[*619]** * *North Dakota* -- *N. D. Cent. Code § 32-03.2-11(2)* (Supp. 1995) (upon request of either party, trier of fact determines **[****107]** whether compensatory damages will be awarded before determining punitive damages liability and amount).

* *Oklahoma* -- *Okla. Stat., Tit. 23, §§ 9.1(B)-(D)* (Supp. 1995-1996) (requires separate jury proceedings for punitive damages); S. 443, 45th Leg., 1st Reg. Sess. (introduced Jan. 31, 1995) (would require courts to strike requests for

517 U.S. 559, *619; 116 S. Ct. 1589, **1620; 134 L. Ed. 2d 809, ***853; 1996 U.S. LEXIS 3390, ****107

punitive damages before trial, unless plaintiff presents *prima facie* evidence at least 30 days before trial to sustain such damages; provide for bifurcated jury trial on request of defendant; and permit punitive damages only if compensatory damages are awarded).

* *Virginia* -- H. 1070, 1994-1995 [***854] Reg. Sess. (introduced Jan. 25, 1994) (would require separate proceedings in which court determines that punitive damages are appropriate and trier of fact determines amount of punitive damages).

## References

22 Am Jur 2d, Damages 747, 754, 805-811, 994, 995, 1032-1035; 67A Am Jur 2d, Sales 1286

8 Am Jur Pl & Pr Forms (Rev), Damages 133, 135-138, 373-375

3 Am Jur Proof of Facts 491, Damages

13 Am Jur Trials 253, Misrepresentation in Automobile Sales

USCS, *Constitution, Amendment 14*

L [****108] Ed Digest, Constitutional Law 778

L Ed Index, Due Process; Punitive Damages; Sale or Transfer of Personal Property

ALR Index, Due Process; Excessive or Inadequate Damages; Punitive Damages; Sale and Transfer of Property

      Annotation References:

Due process clause of *Federal Constitution's Fourteenth Amendment* as violated by amount of punitive damages awarded or by procedures concerning imposition or review of such amount--Supreme Court cases. 129 L Ed 2d ____.

Excessiveness or inadequacy of punitive damages award in cases not involving personal injury or death. 14 ALR5th 242.

Standard of proof as to conduct underlying punitive damage awards--modern status. 58 ALR4th 878.

Sufficiency of showing of actual damages to support award of punitive damages--modern cases. 40 ALR4th 11.

**End of Document**